UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

RGR WATKINS, LLC,   Case No.:  8:13-bk-12147

Chapter 11

Debtor.   EMERGENCY HEARING REQUESTED

_____/

### EMERGENCY MOTION PURSUANT TO 11 U.S.C. § 543(d)(1) TO EXCUSE RECEIVER FROM COMPLIANCE WITH TURNOVER REQUIREMENTS AND TO ESTABLISH POWERS AND DUTIES OF RECEIVER

### EMERGENCY HEARING REQUESTED

CJUF III Atlas Portfolio LLC ("CJUF"), as successor in interest to CSMI Investors, LLC, as successor in interest to Bank of America, N.A., by and through its undersigned counsel, hereby files this Emergency Motion pursuant to 11 U.S.C. § 543(d)(1) for an order excusing Richard A. DeLisle, in his capacity as Court-appointed receiver for RGR Watkins, LLC, from compliance with the turnover requirements of Sections 543(a) and (b) of the Bankruptcy Code and to establish the powers and duties of the receiver in this Chapter 11 case *nunc pro tunc* as to the Petition Date (the "Motion"), and in support thereof states as follows:

### CERTIFICATE OF NECESSITY FOR EMERGENCY HEARING

CJUF seeks an expedited disposition of this Motion because if the estate does not receive immediate relief, the financial and operational stability that the receiver has accomplished for the property over the past twenty (20) months will be seriously jeopardized.  The receiver was appointed because, among other reasons, the Debtor was grossly mismanaging the property at issue in this Chapter 11 proceeding.

191307 v2

1

Over the last twenty (20) months, the receiver has stabilized the property, evicted problem tenants, increased the occupancy, restricted leasing to zoning-compliant tenants who pass background checks, fixed the dilapidated state of the property, and used the rents to reinvest in the property, not to pay fees to insiders. During that twenty months, the receiver has taken the property from a state of disarray and dysfunction to an operative commercial center. Putting the property back under the control of the Debtor and its principal would undo many of the advances made by the Receiver, would be highly disruptive to the tenants, and is not in the best interest of creditors.

CJUF requests an emergency hearing at the earliest possible date and time. CJUF estimates that a hearing on this Motion will require approximately one hour.

## BACKGROUND

**A.     The Loan**

1.     Bank of America ("**BOA**") and Debtor entered into that certain Term Loan Agreement dated August 27, 2007 (the "**Original Loan Agreement**"), whereunder Plaintiff agreed to, *inter alia,* make a commercial loan to Debtor in the amount of $24,200,000.00 (the "**Loan**"). The Loan was to be used to refinance existing debt. A true and correct copy of the Original Loan Agreement is attached hereto as **Exhibit "A"** and incorporated herein by reference.

2.     BOA and Debtor then entered into that certain First Amendment to Term Loan Agreement dated November 25, 2009 (the "**Amended Loan Agreement**"). A true and correct copy of the Amended Loan Agreement is attached hereto as **Exhibit "B"** and incorporated herein by reference.

3. By letter dated April 20, 2010, BOA and Debtor further amended the Amended Loan Agreement (the "**First Loan Agreement Letter**"). A true and correct copy of the First Loan Agreement Letter is attached hereto as **Exhibit "C"** and incorporated herein by reference.

4. By letter dated August 30, 2010, BOA and Debtor further amended the Amended Loan Agreement (the "**Second Loan Agreement Letter**," and together with the Original Loan Agreement, the Amended Loan Agreement, and the First Loan Agreement Letter, the "**Loan Agreement**"). A true and correct copy of the Second Loan Agreement Letter is attached hereto as **Exhibit "D"** and incorporated herein by reference.

5. In accordance with the Original Loan Agreement, BOA funded the loan to the Debtor, and Debtor in turn executed and delivered a Promissory Note in favor of Plaintiff dated August 29, 2007 (the "**Original Note**") in the original principal amount of $24,200,000.00. A true and correct copy of the Original Note is attached hereto as **Exhibit "E"** incorporated herein by reference.

6. In accordance with the Amended Loan Agreement, Debtor executed and delivered a Renewal Promissory Note in favor of BOA dated November 25, 2009 (the "**Renewal Note**") in the amended principal amount of $23,809,697.55. A true and correct copy of the Renewal Note is attached hereto as **Exhibit "F"** incorporated herein by reference.

7. As security for the Loan, Debtor executed and delivered that certain Deed to Secure Debt, Assignment, and Security Agreement dated August 29, 2007, and recorded August 31, 2007, in Deed Book 48237, Page 492, Gwinnett County, Georgia official records (the "**Original Security Deed**"), which granted to BOA a first position security interest in that certain real property known as *The Watkins Business Center* and all improvements, personal property, leases, rents, and fixtures related thereto (the "**Property**"), all as more particularly

described in the Original Security Deed.  A true and correct copy of the Original Security Deed is attached hereto as **Exhibit "G"** and incorporated herein by reference.

8. As additional security for the Loan, Debtor executed and delivered that certain Assignment of Lessor's Interest in Leases dated August 29, 2007, and recorded August 31, 2007, in Deed Book 48237, Page 519, Gwinnett County, Georgia official records (the "**Assignment of Rents**"), which assigned to BOA all leases or rental agreements affecting or covering all or a portion of the Property.  A true and correct copy of the Assignment of Rents is attached hereto as **Exhibit "H"** and incorporated herein by reference.

9. In accordance with the Amended Loan Agreement, Debtor executed and delivered that certain Modification to Deed to Secure Debt, Assignment, and Security Agreement dated November 25, 2009, and recorded December 4, 2009, in Deed Book 49834, Page 404, Gwinnett County, Georgia official records (the "**Modification**," and together with the Original Security Deed, the "**Security Deed**").  A true and correct copy of the Modification is attached hereto as **Exhibit "I"** and incorporated herein by reference.

10. On or about September 29, 2011, BOA executed and delivered to CSMI Investors LLC, a Deed to Secure Debt and Loan Document Assignment, recorded October 24, 2011, in Deed Book 50944, Page 663, Gwinnett County, Georgia official records (the "**First Assignment**"), which assigned to CSMI Investors LLC, all of BOA's right, title, and interest in the Loan Agreement, the Original Note, the Renewal Note, the Security Deed, the Assignment of Rents, and all other documents or instruments evidencing, securing, or otherwise related to the Loan as the same have been amended, supplemented, restated, or otherwise modified from time to time (the "**Loan Documents**").  A true and correct copy of the First Assignment is attached hereto as **Exhibit "J"** and incorporated herein by reference.

11.     On or about September 29, 2011, CSMI Investors LLC, executed and delivered to CJUF a Deed to Secure Debt and Loan Document Assignment, recorded October 24, 2011, in Deed Book 50944, Page 670, Gwinnett County, Georgia official records (the "**Second Assignment**"), which assigned to Plaintiff all of the right, title, and interest of CSMI Investors LLC, to the Loan Documents.  A true and correct copy of the Second Assignment is attached hereto as **Exhibit "K"** and incorporated herein by reference.

B.     **The Defaults**

12.     By its terms, the Renewal Note matured and became due and payable on October 28, 2011.  The Loan has now been matured and unpaid for almost two full years.

13.     In addition to payment default upon maturity, the Debtor failed to pay the real property taxes for the Property for 2011.

14.     Most importantly for purposes of this Motion, the Debtor failed to maintain the Property and permitted significant waste.

15.     Under the Debtor's management, the Property was at only 43% occupancy, and of that amount, a significant number were delinquent.

16.     Under the Debtor's management, the Debtor was entering into leases with businesses who obviously violated zoning regulations, including 22 churches which had to be removed by the fire marshal.

17.     Under the Debtor's management, the Debtor was not doing even simple background checks on tenants and had exceptionally high default rates.

18.     Under the Debtor's management, the Debtor was paying insiders numerous "management" and "consulting" fees from rents while failing to escrow funds for its real property taxes or to pay its lender.

19.     Under the Debtor's management, the Debtor had entered into non-arms length brokerage agreements pursuant to which significantly over-market compensation and commissions were regularly paid by the Debtor for leasing.

20.     Under the Debtor's management, the Debtor invested little money back into the Property, resulting in dilapidated paving, infrastructure, and signage.

**C.      The Appointment of the Receiver**

21.     On December 5, 2011, CJUF filed a lawsuit in the Superior Court for Gwinnett County, Georgia, Case No. 11-A-12656-10 seeking, among other relief, the appointment of a receiver over the Property to prevent waste, mismanagement, and dissipation of rents (the "**Receiver Action**").

22.     On December 22, 2011, the Superior Court held a ten hour evidentiary hearing on whether to appoint a receiver, and heard testimony regarding the various defaults and mismanagement of the Debtor.

23.     At 10:15 p.m. on December 22, 2011, the Superior Court entered its Order Appointing Receiver and Granting Injunctive Relief (the "**Receiver Order**").  A true and correct copy of the Receiver Order is attached hereto as **Exhibit "L"** and incorporated herein by reference.

24.     Richard A. DeLisle was appointed as the receiver (the "**Receiver**") for the Property.

25.     The Receiver has been operating and managing the Property for the past twenty months.  At the time the Receiver took over, there were outstanding mechanic's liens, illegal tenants, 43% occupancy, dilapidated paving, infrastructure, and signage, and general disarray at the Property.

26. When the Receiver took over, he found that the vacant spaces were too filthy to show prospective tenants. He found no files with any background or credit information on any tenants and, in fact, had to reconstruct the tenant files almost entirely just to determine who the correct parties were and who were actually guarantors on the leases, if any. He found tenants living in a unit. He was forced to evict a drug dealer doing business out of a unit. In total, he had to evict over thirty tenants almost immediately as delinquent or otherwise a nuisance to the Property. He found numerous abandoned vehicles left around the premises, along with a tenant storing 18-wheel tractor trailers on site. One tenant he found was openly advertising sexually-themed events to children.

27. Since taking over, the Receiver has significantly improved the condition of the Property, increased occupancy, paid outstanding liens, gained a detailed understanding of the financial and operational issues of the Property, and has issued monthly, transparent receivership reports. The Receiver has reinvested the rents into the Property rather than disbursed them as opaque fees. The Receiver has replaced the over-market brokerage arrangements and hired third-party professionals at arms length.

28. Although the Receiver has only increased occupancy to 47%-50%, the current tenants are almost uniformly not delinquent, have clear backgrounds, and are not engaged in illegal activity.

29. Immediately after the Receiver Order was entered, the Receiver took control over the cash disbursements of the Debtor, and is the sole signatory on the Debtor's cash accounts. Given the Receiver's in-depth knowledge of the Property and the results obtained over the past twenty months, it would be extremely disruptive and harmful to the estate and all its creditors to require turnover.

**D.     The Arbitration**

30.     After the Receiver Order was entered, the Debtor, and its principal and guarantor Robert G. Roskamp ("**Roskamp**"), filed motions to stay any further litigation and to compel CJUF to arbitrate the Loan disputes.

31.     Since January 2011, CJUF, Debtor, and Roskamp have been litigating in arbitration regarding the Loan.  In the meantime, CJUF has refrained from foreclosing upon the Property and taking title while the Receiver rehabilitates it.

**E.     The Bankruptcy**

32.     On September 12, 2013, the Debtor filed its voluntary petition for chapter 11 (the "**Petition Date**").

33.     As of August 1, 2013, the Debtor is currently indebted to CJUF under the terms of the Renewal Note in the following amounts: (i) principal of $23,123,778.55; (ii) interest at the note rate of $924,951.14; (iii) interest at the default rate of $1,011,701.87; and (iv) late fees of $924,951.14, with additional interest accruing at the rate of $3,867.73 per diem, plus attorney's fees and costs.

34.     Unfortunately, recent appraisals of the Property show that the Property has a current fair market value of less than $14,000,000.00, giving CJUF an unsecured deficiency claim of over $12,000,000.00.

35.     By the Debtor's own admission, this is a single asset real estate case (Dkt. No. 1).

36.     According to the Debtor's List of Top Twenty Unsecured Creditors (Dkt. No. 2), the largest claim is only $44,057.50, and the top three claims are owed to Debtor's lawyers and to the American Arbitration Association.  The rest are unknown claims of creditors serving the Property on the Receiver's behalf.

37. It is therefore apparent that the only significant creditor of the Debtor is CJUF, and that this bankruptcy is a mere two party dispute.

## RELIEF REQUESTED AND MEMORANDUM OF LAW

Pursuant to § 101(11) of the Bankruptcy Code, a prior-appointed receiver becomes a "custodian" for a debtor's assets, books, and records when a bankruptcy is filed. Specifically, § 101(11)(A) defines "custodian" as a "receiver or trustee of any property of the debtor, appointed in a case or proceeding not under this title." Section 101(11)(C) in turn defines a "custodian" as "trustee, receiver, or agent under applicable law, or under contract, that is appointed or authorized to take charge of the property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of debtor's creditors."

Generally, upon obtaining knowledge of a bankruptcy proceeding, a custodian of a debtor's property (i) is not permitted to disburse or take any action in the administration of property of the estate except to preserve such property; (ii) must turn over to the debtor any and all property of the debtor that was held by or transferred to the custodian, including proceeds, product, off-spring, rents or profits of such property; and (iii) must file an accounting of such property. See 11 U.S.C. §§ 543(a) and (b).

"To mollify the seemingly harsh and apparently inflexible requirement of § 543(b), Congress provided in § 543(d) for dispensation of the apparent mandatory requirement of turnover provisions of the Section under certain circumstances." *Matter of WPAS, Inc.*, 6 B.R. 40, 43 (Bankr. M.D. Fla. 1980). Specifically, § 543(d)(1) provides as follows:

>  (d) after notice and hearing, the Bankruptcy Court --
>
>  (1) may excuse compliance with subsection (a), or (c) of this section if the interest of creditors and, if the debtor is not solvent, equity security holders would be better served by

> permitting a custodian to continue in possession, custody or control of such property . . .

*See also In re Basil St. Partners, LLC*, 477 B.R. 856, 864 (Bankr. M.D. Fla. 2012).

"Accordingly, the Court may dispense with the enforcement of the mandate to oust a non-bankruptcy custodian from possession and control of the properties of the Debtor and may authorize the custodianship to proceed, after notice and hearing, if the *interest of creditors* (emphasis supplied) would be better served." *WPAS*, 6 B.R. at 43 (emphasis added and in original).

"This Section is merely a recognition of a long-recognized doctrine of abstention now expressly codified by Congress in § 305 of the Bankruptcy Code which permits the court to decline to entertain any controversy which otherwise would be within its judicial competence if to do so would be in the best interest of all parties concerned, although not necessarily the interest of the debtor." *Id.* The key point to take from the statute and these cases is that the interests of the creditors is considered paramount.

Additionally, in analyzing whether to exercise its discretion under § 543(d)(1), courts often consider several factors:

(1) whether there will be sufficient income to fund a successful reorganization;

(2) whether the debtor will use the turnover property for the benefit of the creditors;

(3) whether there has been mismanagement by the debtor;

(4) whether or not there are avoidance issues raised with respect to property retained by a receiver, because a receiver does not possess avoiding powers for the benefit of the estate;

(5) the fact that the bankruptcy automatic stay has deactivated the state court receivership action.

*In re Dill*, 163 B.R. 221, 225 (Bankr. E.D.N.Y. 1994). "The interests of the debtor, however, are not part of the criteria considered when applying section 543(d)(1)." *Id.* (citing *4 Collier on Bankruptcy,* ¶ 543.05 at 543–12 (15th Ed.1993)).

The instant matter is a textbook example of proper abstention. Here, the Property has not been managed by the Debtor for almost two years. When the Debtor was managing the Property, there was waste, dissipation of rents, non-arm's length brokerage arrangements, opaque fees to insiders, illegal activity on the premises, dilapidated infrastructure, low quality tenants, zoning violations, low occupancy rates, and no escrowing for taxes. The Receiver has rehabilitated the Property, increased occupancy, and developed relationships with the current, higher quality tenants.

Although it may be in the Debtor's best interest to remove the Receiver and disrupt the Property, that is not a factor which courts regard. What courts do consider, however, is whether the removal would be in the creditors' best interest. In this case, there is only one major creditor, which proportionally holds likely 99% of all claim amounts, secured and unsecured. Leaving the Receiver in control to manage the Property, rather than disrupting twenty months of rehabilitation, is plainly the preferred solution for creditors.

A consideration of the factors in the case law also confirms this conclusion. First, the Debtor does not have anywhere near sufficient income to repay CJUF the $26,000,000.00 it owes, nor will it through any plan. Second, the Debtor will not use the Property to benefit CJUF or its other creditors, but to gamble with the Property, condominiumizing it, leaving the Property fractured and worth even less than it already is, with no downside to the Debtor and significant downside for CJUF. Third, there has been a long history of mismanagement. Fourth, as the Property has been in the Receiver's control for almost two years, there are no significant

avoidance actions which the Receiver could not bring. To the extent any do exist, they would include various associates and insiders of the Debtor, which actions the Debtor is not likely to bring even if it could. Fifth, although the automatic stay deactivates the receivership, because this is a two-party dispute with few other creditors and significant negative equity in the Property, and because the Debtor has been absent from the Property for almost two years, the principles underlying the automatic stay are not implicated and there is no justification for blocking continued management by the professional Receiver. *See In re Uno Broad. Corp.*, 167 B.R. 189, 201 (Bankr. D. Ariz. 1994)("There would undoubtedly be substantial disruption, duplication, costs, and confusion arising out of another management change at this point.").

Most importantly, the Debtor has indicated that it will be filing a plan in thirty days, a plan that CJUF will not support and which will likely be unconfirmable. Considering the timeframes of this case, it is illogical to remove the Receiver, with all that attendant expense, disruption, and risk, only to have the plan fail and then go through the disruption and risk of putting the Receiver back in place sixty days from now.

The Debtor's proposed plan will not depend on, or require, the Debtor having current possession and control of the Property. Let the Debtor propose its plan, and if the Debtor can confirm it as quickly as it requests, the plan can dictate who controls the Property once and for all. If the Debtor cannot confirm its proposed plan, which CJUF believes is inevitable, the Receiver can remain in place, and the Property is never disrupted. With such a short timeframe, and with so much at stake for CJUF and so little at stake for the Debtor, it would be completely at odds with the creditors' interest to remove the Receiver, and in no way prejudicial to the Debtor for the Court to retain him.

When a receiver is excused from the turnover requirements of § 543, the bankruptcy case continues with the receiver in possession of the Debtor's property subject to the bankruptcy court's jurisdiction. *In re 245 Assocs. LLC*, 188 B.R. 743, 749 (Bankr. S.D.N.Y. 1995). CJUF proposes that the Court establish the powers and duties of the Receiver in this Chapter 11 case so as to avoid any disputes in connection therewith. Specifically, CJUF requests that the Court grant the Receiver the powers and rights and impose the duties of, a debtor-in-possession on the Receiver under Sections 1107 and/or 1108 of the Bankruptcy Code and confirm his powers under the Receiver Order. CJUF assets that it is in the best interests of all creditors for the Receiver to be empowered with the powers and rights, and have the duties, of a Debtor-in-possession pursuant to Sections 1107 and/or 1108 of the Bankruptcy Code. *See Uno Broad.*, 167 B.R. at 201 ("[T]he receiver, as a custodian excused from compliance with turnover in a bankruptcy case, now must have obligations and responsibilities to *all* creditors of the estate and, assuming solvency, to the equity security holders of the estate.").

Under the facts of this Chapter 11 case, excusing the Receiver from the turnover requirements of § 543(b) will be more beneficial to the creditors than if the Court would require turnover. No viable party knows the Debtor's operations and assets better than the Receiver, and the Debtor has been absent for almost two years. The Receiver is a professional who has rehabilitated the Property, while he Debtor has shown itself to be an amateur at best. To that end, CJUF requests that the Court enter an order giving the Receiver the powers, rights, and duties of a debtor-in-possession under Sections 1107 and/or 1108 of the Bankruptcy Code and affirming his powers under the Receiver Order.

## CONCLUSION

WHEREFORE, CJUF respectfully requests that this Court (i) issue an Order *Nunc Pro Tunc* to the Petition Date, pursuant to § 543(1) of the Bankruptcy Code excusing the Receiver

from the turnover requirements of §§ 543(a) and (b) of the Bankruptcy Code (ii) granting the Receiver the powers, rights and duties of a debtor-in-possession under Sections 1107 and/or 1108 of the Bankruptcy Code; (iii) authorizing the Receiver to be compensated pursuant to §§ 326 and 330 of the Bankruptcy Code; (iv) confirming the Receiver's powers under the Receiver Order,; and (v) granting such other and further relief as is deemed just and proper under the circumstances.

I HEREBY CERTIFY that the undersigned counsel has made a bona fide effort to resolve this matter without a hearing.

Dated this 15th day of September, 2013.

Respectfully submitted,

/s/ Denise D. Dell-Powell
Denise D. Dell-Powell, Esquire
Florida Bar Number: 0890472
Michael A. Nardella, Esquire
Florida Bar Number: 51265
**BURR & FORMAN LLP**
450 S. Orange Avenue, Suite 200
Orlando, FL 32801
Phone: (407) 540-6607
Fax: (407) 244-0889
Email: denise.dellpowell@burr.com
mnardella@burr.com

**ATTORNEYS FOR MOVANT**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished via electronic mail using the Court's CM/ECF system on September 15, 2013 and/or via First Class U.S. Mail on September 16, 2013 to all parties on the attached creditors matrix

/s/ Denise D. Dell-Powell
Denise D. Dell-Powell, Esq.