UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

RGR WATKINS, LLC,

       Debtor.

_____/

Chapter 11

Case No. 8:13-bk-12147-KRM



**AMENDED AND RESTATED DISCLOSURE STATEMENT**
**FOR PLAN OF REORGANIZATION FOR RGR WATKINS, LLC**
**UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE[1]**

Tampa, Florida
Dated November 5, 2013

Stichter, Riedel, Blain & Prosser, P.A.
Edward J. Peterson III (FBN 0014612)
Amy Denton Harris (FBN 0634506)
Stichter Riedel Blain & Prosser, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone: (813) 229-0144
Facsimile: (813) 229-1811
epeterson@srbp.com; aharris@srbp.com
Counsel for Debtor and
  Debtor in Possession

---

[1] Richard A. DeLisle of Fickling Management Services has served as receiver for the Debtor's principal asset since December 2011, and is in possession of the books and records related to the asset. Accordingly, this Disclosure Statement has been prepared utilizing information readily available to the Debtor.

THIS AMENDED AND RESTATED DISCLOSURE STATEMENT (THE "**DISCLOSURE STATEMENT**") MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN OF REORGANIZATION FOR RGR WATKINS, LLC UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE (THE "**PLAN OF REORGANIZATION**" OR THE "**PLAN**"), AND NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT WILL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THE DESCRIPTION OF THE DEBTOR'S PLAN OF REORGANIZATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN ITSELF. **EACH CREDITOR AND HOLDER OF AN INTEREST SHOULD READ, CONSIDER AND CAREFULLY ANALYZE THE TERMS AND PROVISIONS OF THE PLAN.**

THE SOLICITATION OF ACCEPTANCES OF THE PLAN OR THE GIVING OF ANY INFORMATION OR THE MAKING OF ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS OR DOCUMENTS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN IS NOT AUTHORIZED BY THE PLAN PROPONENT, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR. SUCH ADDITIONAL REPRESENTATIONS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR, WHO IN TURN WILL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR ACTION AS MAY BE DEEMED APPROPRIATE. THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF. CREDITORS AND HOLDERS OF INTERESTS ARE ENCOURAGED TO REVIEW THE BANKRUPTCY DOCKET IN THE BANKRUPTCY CASE IN ORDER TO EVALUATE EVENTS WHICH OCCUR BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE DATE OF THE CONFIRMATION HEARING. **ALL CREDITORS THAT ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER**

**THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN OF REORGANIZATION AND THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT, PRIOR TO SUBMITTING A BALLOT PURSUANT TO THIS SOLICITATION.**

IN THE EVENT THAT ANY OF THE CLASSES OF HOLDERS OF IMPAIRED CLAIMS VOTE TO REJECT THE PLAN (1) THE DEBTOR MAY ALSO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN WITH RESPECT TO THAT CLASS UNDER THE SO-CALLED "CRAMDOWN" PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE (11 U.S.C. §1129(b)) AND, IF REQUIRED, MAY FURTHER AMEND THE PLAN TO CONFORM TO SUCH REQUIREMENTS OR (2) THE PLAN MAY BE OTHERWISE MODIFIED OR WITHDRAWN AS PROVIDED THEREIN. THE REQUIREMENTS FOR CONFIRMATION, INCLUDING THE VOTE OF HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN AND CERTAIN OF THE STATUTORY FINDINGS THAT MUST BE MADE BY THE BANKRUPTCY COURT, ARE SET FORTH UNDER THE CAPTION "VOTING ON AND CONFIRMATION OF THE PLAN."

APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN, NOR DOES SUCH APPROVAL CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

**THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND HOLDERS OF EQUITY INTERESTS. ALL CREDITORS AND HOLDERS OF EQUITY INTERESTS ARE THEREFORE URGED TO VOTE IN FAVOR OF THE PLAN. INDEED, IT IS ANTICIPATED THAT HOLDERS OF ALLOWED UNSECURED CLAIMS WILL BE PAID IN FULL OVER TIME UNDER THE PLAN.** TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED AND EXECUTED AND RECEIVED BY NO LATER THAN THE TIME SET BY THE COURT.

## INDEX TO EXHIBITS

Exhibit 1        Final Term Sheet Issued July 26, 2007 by Bank of America, N.A.

Exhibit 2        Counterclaims Against CJUF

Exhibit 3        Verified Petition

Exhibit 4        Receiver's August 2013 Report

Exhibit 5        Release Prices

Exhibit 6        Projections

Exhibit 7        Liquidation Analysis

**AMENDED AND RESTATED DISCLOSURE STATEMENT
PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE**

## INTRODUCTION

RGR WATKINS, LLC (the "**Debtor**"),  the Debtor and Debtor in Possession in the Bankruptcy Case, submits this Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code, in connection with the solicitation of votes on the Plan from Holders of Impaired Claims against the Debtor and the hearing on confirmation of the Plan as scheduled by the Bankruptcy Court.

This Disclosure Statement is subject to the approval of the Bankruptcy Court in accordance with Section 1125(b) of the Bankruptcy Code as containing information of a kind and in sufficient detail adequate to enable a hypothetical reasonable investor typical of the Holders of Claims of the relevant Voting Classes (as defined below) to make an informed judgment whether to accept or reject the Plan.  Effort has been made to provide meanings of capitalized and other terms used in this Disclosure Statement.  Reference is made to the Plan, however, for the actual meanings of all capitalized and other terms used in this Disclosure Statement and in the Plan and for controlling language with respect to any provision referenced in this Disclosure Statement or in the Plan.  Terms used in this Disclosure Statement and in the Plan are defined in Article 2 of the Plan.  In the event of a conflict between the definition of any term or any other provision contained in this Disclosure Statement and the corresponding definition or provision contained in the Plan, the definition or provision contained in the Plan shall control.

In the opinion of the Debtor, the treatment of Claims and Interests under the Plan contemplates a substantially greater recovery than that which is likely to be achieved under other alternatives for the reorganization or liquidation of the Debtor.  If the Plan is not confirmed, there is a substantial likelihood that unsecured creditors will be left with no recovery at all.

The Debtor believes that confirmation of the Plan is clearly in the best interests of Creditors and Holders of Equity Interests, and strongly recommends that Creditors holding Allowed Claims in the Voting Classes vote to accept the Plan.

## PURPOSE OF THIS DISCLOSURE STATEMENT

The purpose of this Disclosure Statement is to provide the Holders of Claims and Equity Interests with adequate information to make an informed judgment about the Plan. This information includes, among other things, (a) a summary of the Plan and an explanation of how the Plan will function, including the means of implementing and funding the Plan, (b) general information about the history and business of the Debtor prior to the Petition Date and the events leading to the filing of the Bankruptcy Case, and

1

(c) a brief summary of significant events which have occurred to date in the Bankruptcy Case.

This Disclosure Statement contains important information about the Plan and considerations pertinent to a vote for or against the Confirmation of the Plan. All Holders of Claims and Equity Interests are encouraged to carefully review this Disclosure Statement.

Unless otherwise defined herein, all capitalized terms used in this Disclosure Statement have the meanings ascribed to them in the Plan. Any term used in the Plan or herein that is not defined in the Plan or herein and that is used in the Bankruptcy Code, the Bankruptcy Rules or the Local Rules of the Bankruptcy Court has the meaning assigned to that term in the Bankruptcy Code, the Bankruptcy Rules or the Local Rules, as the case may be. **IF THERE IS ANY CONFLICT BETWEEN THE DEFINITIONS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE DEFINITIONS CONTAINED IN THE PLAN, THE DEFINITIONS CONTAINED IN THE PLAN SHALL CONTROL**.

## VOTING INSTRUCTIONS

**Who May Vote**

Only the Holders of Claims and Equity Interests that are deemed "allowed" under the Bankruptcy Code and that are "Impaired" under the terms and provisions of the Plan (the **"Voting Classes"**) are permitted to vote to accept or reject the Plan. For purposes of the Plan, only the Holders of Allowed Claims in the Voting Classes are Impaired under the Plan and thus may vote to accept or reject the Plan. Under the Plan, the Claims classified in Classes 2, 3, 4, and 5 are Impaired under the Plan and are entitled to vote to accept or reject the Plan and thus constitute the "Voting Classes" thereunder.

**How to Vote**

Each Holder of a Claim in a Voting Class should read this Disclosure Statement, together with the Plan and other exhibits, in their entirety. After carefully reviewing the Plan and this Disclosure Statement and their respective exhibits, please complete the enclosed Ballot, including indicating your vote thereon with respect to the Plan, and return the Ballot as provided below. Please note that your vote and election cannot count unless you return the enclosed Ballot.

If you are a member of a Voting Class and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please contact Susan McKee at (813) 229-0144.

2

**YOU SHOULD COMPLETE AND SIGN THE BALLOT AND RETURN IT AS DESCRIBED BELOW.  IN ORDER TO BE COUNTED, BALLOTS MUST BE DULY COMPLETED AND EXECUTED AND RECEIVED BY NO LATER THAN THE DATE FIXED BY THE BANKRUPTCY COURT IN THE ORDER APPROVING DISCLOSURE STATEMENT AND FIXING DATES FOR CONFIRMATION (THE "BALLOT DEADLINE").**

Completed Ballots should be sent by regular mail, hand delivery, or overnight delivery, **SO AS TO BE RECEIVED NO LATER THAN THE BALLOT DEADLINE,** to:

Clerk of the United States Bankruptcy Court
Sam M. Gibbons United States Courthouse
801 N. Florida Avenue, Suite 555
Tampa, Florida 33602

Alternatively, Ballots can be filed electronically on the Court's website at www.flmb.uscourts.gov by selecting Chapter 11 eBallots.

**Acceptance of Plan and Vote Required for Class Acceptance**

As the Holder of an Allowed Claim in the Voting Classes, your vote on the Plan is extremely important.  In order for the Plan to be accepted and thereafter confirmed by the Bankruptcy Court without resorting to the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code as to other classes of Allowed Claims, votes representing at least two-thirds in amount and more than one-half in number of Allowed Claims of each Impaired Class of Claims that are voted must be cast for the acceptance of the Plan.  The Debtor is soliciting acceptances only from members of the Voting Classes.  The Debtor or its agents may contact you with regard to your vote on the Plan.

To meet the requirement for confirmation of the Plan under the "cramdown" provisions of the Bankruptcy Code with respect to any Impaired Class of Claims or Equity Interests which votes to reject the Plan (a "**Rejecting Class**"), the Debtor would have to show that all Classes junior to the Rejecting Class will not receive or retain any property under the Plan unless all Holders of Claims in the Rejecting Class receive, under the Plan, property having a value equal to the full amount of their Allowed Claims.

**Confirmation Hearing and Objections to Confirmation**

The Bankruptcy Court will schedule a hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"), which may be adjourned from time to time by the

3

Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. The Bankruptcy Court has directed that any objection to confirmation of the Plan must be in writing and specify in detail the name and address of the objector, the basis for the objection and the specific grounds for the objection, and the amount of the Claim held by the objector. Consistent with Rule 3020(b) of the Federal Rules of Bankruptcy Procedure and Local Rule 3020-1(a), any such objection must be filed with the Bankruptcy Court so as to be actually received on or before the deadline set by the Court.

## HISTORY OF THE DEBTOR

The Debtor owns Watkins Business Center n/k/a Gateway Business Park (the "**Project**") located in the largest community improvement district in the State of Georgia just off Interstate 85 and Jimmy Carter Boulevard in Norcross, approximately thirty (30) miles northeast of Atlanta. The Project is situated on 41 acres and is comprised of twenty five (25) one-story buildings offering office/flex, retail, and industrial space. The Project has 514,218 square feet and offers spaces ranging from 1,500 square feet to stand-alone buildings with thousands of square feet.



## EVENTS LEADING TO THE FILING OF THE REORGANIZATION CASE

On April 3, 2007, an affiliate of the Debtor sold a real estate project with the intention of rolling the proceeds from the sale into another real estate project so as to take advantage of the benefits a 1031 exchange. Section 1031 of the Internal Revenue Code (the "**IRC**") requires that: (i) the potential replacement properties be identified within forty-five (45) days of the date that the relinquished property is sold; and (ii) the exchange be completed no later than one hundred eighty (180) days after the sale of the relinquished property or the due date (with extensions) of the income tax return for the tax year in which the relinquished property was sold, whichever is earlier.

4

http://www.irs.gov/uac/Like-Kind-Exchanges-Under-IRC-Code-Section-1031.    In order to satisfy the requirements of Section 1031 of the IRC, the replacement property was required to be identified no later than May 18, 2007, and the purchase of the replacement property was required to close no later than September 30, 2007.  The Project was timely identified as a potential replacement property, and the Debtor began conducting due diligence and soliciting financing for the Project.

In or about May 2007, the Debtor began communicating with Bank of America, N.A. ("**BOA**") about financing a portion of the purchase price for the Project.  During those discussions, the Debtor advised BOA that it intended to convert the Project to business condominiums in order to repay the debt, and provided BOA with detailed sales projections.  BOA was well aware of the Debtor's plan to convert the Project to business condominiums.  Indeed, it reviewed the sales projections and other documents related to the conversion process and indicated that it would approve the conversion.  On or about July 26, 2007, BOA issued a final loan term sheet to the Debtor.  The term sheet specifically acknowledged that the Project would be converted to business condominiums and stated that "[a]ny contemplated future conversion of the property to a for-sale condominium must be acceptable to Lender."  A copy of the term sheet is attached hereto as Exhibit 1 and incorporated herein by reference.

The loan and acquisition of the Project closed on August 29, 2007.  The purchase price was approximately $36,000,000, of which approximately $20,700,000.00 was financed by BOA and the balance of approximately $15,300,000 was funded by equity contributions from the principals of the Debtor.  The Debtor and BOA entered into a Loan Agreement, and the Debtor simultaneously executed a Promissory Note.   In addition, Robert G. Roskamp ("**Roskamp**") executed a partial Guaranty.

After the closing, the Debtor continued to work toward the condominium conversion.  BOA was intimately involved in the process and was regularly and fully advised of the status of the conversion process.  Between September 2007 and November 2008, the Debtor: ordered appraisals and surveys; hired counsel to prepare real estate contracts, the condominium disclosure, declaration, and other documents; hired Don Markey ("**Markey**") of National Constructors to renovate the Project; began renovation of the Project; began marketing the condominiums; and began to hire a sales team.  During this time, BOA acquiesced to the conversion and financed the renovations.  Indeed, BOA employee Mary A. Kelly ("**Kelly**") and Markey exchanged several emails regarding what BOA needed to underwrite Phase 1 of the condominium conversion.  Moreover, BOA funded the renovation work performed by National Constructors.

Notwithstanding its previous acquiescence to the conversion, on November 25, 2008, Kelly indicated in an email that the bank was "uncomfortable moving forward with the condo conversion loan approval."  By that time, the Debtor had expended substantial sums on appraisals, surveys, legal fees, construction, and sales and marketing.

Nevertheless, the Debtor continued to work to generate new leads for the sales of business condominiums.

In May 2009, Kelly and BOA employees Sarah Pflasterer and Steve Cohn had a conference call with Jim Corbett and Tony St. John, employees of the Debtor, regarding the leasing and sales efforts at the Project. Although BOA indicated that it preferred to focus on rental activity given the current market trends, it did not rule out the condominium conversion, which was already in progress. In July 2009, the Debtor's employees continued to communicate with BOA regarding the conversion progress.

In November 2009, the Debtor and BOA entered into an Amended Loan Agreement, Renewal Note, and Modification to Deed to Secure Debt, Assignment, and Security Agreement. In addition, Roskamp executed a Consent. In 2010, the Debtor and BOA entered into a First Loan Agreement Letter, a Second Loan Agreement Letter and a Third Loan Agreement Letter. During 2010, BOA continued to acquiesce in the Debtor's conversion efforts, and the Debtor to continue to expend funds in furtherance of the conversion.

As the October 28, 2011 loan maturity date approached, the Debtor and BOA were still in active discussions regarding the condominium conversion. On September 29, 2011, BOA executed and delivered to CSMI Investors, LLC a Deed to Secure Debt and Loan Document Assignment that purported to assign all of BOA's right, title and interest in the loan documents to CSMI Investors, LLC. That same day, CSMI Investors, LLC executed and delivered to CJUF III Atlas Portfolio, LLC ("**CJUF**") a Deed to Secure Debt and Loan Document Assignment that purported to assign all of CSMI Investors, LLC's right, title and interest in the loan documents to CJUF.

The Debtor timely made all payments as required by the loan documents. After the assignment to CJUF, the Debtor contacted CJUF to discuss the loan relationship and a refinancing or renewal. Those discussions were unsuccessful and the loan matured on October 28, 2011.

**The Georgia Action and Arbitration**

On December 5, 2011, CJUF filed a complaint in the Superior Court of Gwinnett County, Georgia against the Debtor seeking: (i) the appointment of a receiver; (ii) an injunction; and (iii) damages for breach of contract (the "**Georgia Action**"). On December 9, 2011, the Debtor filed a motion to compel arbitration and stay the Georgia Action pending arbitration. On December 22, 2011, Richard A. DeLisle ("**DeLisle**") of Fickling Management Services ("**Fickling**") was appointed as receiver for the Project. On January 12, 2012, the Georgia Action was partially stayed pending arbitration (the "**Georgia Arbitration**").

Georgia is a non-judicial foreclosure state and real property which is being foreclosed can be sold the first week after the month of weekly advertising.  In January 2012, CJUF began to advertise the Project for sale, and a sale was scheduled to occur in February 2012.  On information and belief, about that time, CJUF learned that BOA had obtained an appraisal indicating that the debt amount would be satisfied by the value of the Project.  The February sale date was cancelled and has not been rescheduled.  In the interim, interest and costs have continued to accrue on the loan.

Meanwhile, the Georgia Arbitration continued.  The Debtor filed an answer, affirmative defenses, and counterclaim, and CJUF filed an answer and affirmative defenses to the counterclaim.  In order to prosecute its counterclaims, the Debtor issued subpoenas for documents and depositions to BOA.  The arbitration proceedings stalled, in large part, due to BOA's refusal to respond to discovery propounded by the Debtor.  Ultimately, the Georgia Action and the Georgia Arbitration were stayed by the filing of the Chapter 11 case.

**The Florida Action and Arbitration**

In addition, on December 7, 2011, CJUF filed a complaint in the United States District Court for the Middle District of Florida, Tampa Division, against Roskamp for breach of a guaranty (the "**Florida Action**").  On January 5, 2012, Roskamp filed a motion to compel arbitration and stay the Florida Action pending arbitration.  On January 9, 2012, the Florida Action was stayed pending arbitration (the "**Florida Arbitration**").  In the Florida Arbitration, Roskamp filed an answer, affirmative defenses, and counterclaim, and CJUF filed an answer and affirmative defenses to the counterclaim.  In order to prosecute his counterclaims, Roskamp issued subpoenas for documents and depositions to BOA.  The arbitration proceedings stalled, in large part, due to BOA's refusal to respond to discovery propounded by the Debtor.  The Florida Action and the Florida Arbitration have been temporarily stayed pursuant to an order of the Bankruptcy Court.

**The North Trail Action**

Moreover, on April 19, 2012, CJUF filed a complaint in the Circuit Court of the Twelfth Judicial Circuit, in and for Sarasota County, Florida (the "**North Trail Action**") seeking to foreclose on property (the "**North Trail Property**") owned by North Trail Developments LLC ("**North Trail**") and also pledged as collateral for the original BOA loan.  The North Trail Action has been temporarily stayed pursuant to an order of the Bankruptcy Court.

**Summary of Counterclaims**

The Debtor would not have financed the acquisition of the Project with BOA or executed any of the amended loan documents if BOA had advised the Debtor that it would not ultimately approve the conversion of the Project to business condominiums. If the Debtor had been advised of BOA's true intention, the Debtor would have secured financing from another lender, or refinanced the Project with another lender.

The Debtor and Roskamp believe that BOA fraudulently induced them to enter into the financing transaction, expend substantial sums on the conversion process and, later, execute the amended loan documents. Accordingly, the Debtor and Roskamp have filed counterclaims against CJUF, as successor to BOA, in both the Georgia Arbitration and the Florida Arbitration. Copies of the counterclaims are attached hereto as <u>Exhibit 2</u> and incorporated herein by reference. CJUF has filed an answer and affirmative defenses to each counterclaim.

The Debtor and Roskamp have sought discovery from BOA in connection with their fraudulent inducement counterclaims. BOA has failed and refused to comply with subpoenas for documents and depositions. Accordingly, the Debtor and Roskamp filed in the United States District Court for the Middle District of Florida, Tampa Division, a verified petition to compel compliance with the subpoenas. A copy of the verified petition is attached hereto as <u>Exhibit 3</u> and incorporated herein by reference.

**Kaltenbacher**

On June 5, 2009, Roskamp and Phil Kaltenbacher entered into a Payment Agreement, pursuant to which Roskamp agreed to pay to Kaltenbacher 69.676% of any amounts that Kaltenbacher is required to pay to Sovereign Bank as a result of a guaranty executed by Kaltenbacher. Any amounts owed by Roskamp are secured by the Kaltenbacher Mortgage, which is a junior Lien on the Project. Kaltenbacher's claims under the Payment Agreement could be in excess of $20 million.

**Filing of Chapter 11 Case**

The Debtor filed the Chapter 11 petition in an effort to preserve the value of the Project, and to restructure its debts for the benefit of Creditors and the Estate.

## <u>SUMMARY OF PREPETITION FINANCIAL PERFORMANCE</u>

As discussed above, DeLisle of Fickling was appointed as receiver for the Project on December 22, 2011. Mr. DeLisle has been managing the Project and its finances. A copy of the receiver's August 2013 report reflecting the prepetition financial performance of the Project is attached hereto as <u>Exhibit 4</u> and incorporated herein by reference.

## SIGNIFICANT EVENTS TO DATE IN THE REORGANIZATION CASE

### Case Developments

The Debtor filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on September 12, 2013, along with its: (i) application to employ Stichter, Riedel, Blain & Prosser, P.A. as counsel; (ii) case management summary; (iii) emergency motion to use cash collateral; (iv) complaint against CJUF for preliminary injunction; and (v) motion for preliminary injunction.

On September 15, 2013, CJUF filed a motion to excuse the receiver from compliance with the turnover requirements of the Bankruptcy Code. CJUF also filed a response in opposition to the Debtor's motion to use cash collateral on September 16, 2013.

The Court held first day hearings on September 16, 2013. At the hearing, the Debtor announced that it had reached an agreement with CJUF to: (i) leave the receiver in place until November 15, 2013, or further order of the Court and, consistent therewith, excuse the receiver from compliance with the turnover requirements of the Bankruptcy Code; (ii) authorize, on an interim basis through November 15, 2013, the Debtor, through the receiver, to use cash collateral in accordance with a budget prepared by the receiver; (iii) enjoin CJUF from taking any action in the Georgia Action, the Georgia Arbitration, the Florida Action, the Florida Arbitration, or the North Trail Action until November 15, 2013, or such later date as may be subsequently ordered by the Court or agreed to by the parties; and (iv) enjoin Roskamp from transferring personal assets outside the ordinary course of business. The Court has entered orders consistent with the foregoing.

On October 30, 2013, the Debtor filed a motion on negative notice seeking approval of a stipulation with Gwinnett County Water Resources with respect to the provision of water and sewer services at the Project. The Section 341 Meeting of Creditors was initially scheduled for October 21, 2013 at 9:30 a.m., but has been continued to November 13, 2013 at 2:30 p.m.

### Operational Developments

Under the receiver's direction, Van Smith ("**Smith**") is the Associate Broker and Director of Leasing for the Project. Since the Petition Date, the Debtor and its agents have referred two substantial, qualified potential tenants to Smith. One of the tenants is ready to sign a lease for approximately thirty-six thousand (36,000) square feet of space, which lease would be extremely beneficial to the estate. The Debtor, its agents, and the potential tenants have reported that Smith has been unavailable for extended periods of time, his voicemail is full, and he generally is not very responsive. The receiver has not

provided anyone to serve as back-up for Smith, and has generally directed parties to wait for his return.  This conduct could be detrimental to the Debtor, its Estate, and Creditors. The Debtor believes that its agents would better serve the leasing needs of the Project and improve the value of the Project for the Estate and Creditors.

## SUMMARY OF PLAN OF REORGANIZATION

The Plan generally provides for one of the following two options: (i) the Debtor will transfer the Project and the North Trail Property to CJUF in full settlement and satisfaction of its Allowed Claim, and Roskamp will pay Allowed Unsecured Claims in full with interest over a period of five (5) years from the Effective Date; **or** (ii) the Debtor will retain the Project; stabilize occupancy, rental rates, and rental revenues; sell buildings 1723, 1750, 1755, 6265, 6269 (the "**Warehouse Buildings**") within two (2) years of the Effective date and CJUF shall provide partial releases of its liens based upon release prices equal to the greater of eighty percent (80%) of the net sale proceeds or Thirty Dollars ($30.00) per square foot, or transfer the Warehouse Buildings to CJUF in exchange for a Thirty Dollar ($30.00) per square foot reduction of the principal balance of CJUF's Allowed Claim; and pay Allowed Unsecured Claims in full with interest over a period of five (5) years from the Effective Date.

If the Debtor retains the Project, at the Debtor's sole option, the Debtor may also: (i) sell one or more of buildings 6090, 6080, 6070, 6060, 6050, 6040, 6030, 6020, 6010, and 6000 as stand-alone buildings, each of which may be sold members of a business condominium association in order to efficiently and effectively manage the common areas and elements; (ii) sell building 6500 (A-E) as a stand-alone building; (iii) either convert buildings 6350, 6320, 6290, 6270, 1756, and 1710 into multiple business condominium units and sell each of the units, or sell buildings 6350, 6320, 6290, 6270, 1756, and 1710 as stand-alone buildings, each of which may be sold members of a business condominium association in order to efficiently and effectively manage the common areas and elements; (iv) pay CJUF's Allowed Claim in full with interest over a period of five (5) years from the Effective Date; and (v) pay Allowed Unsecured Claims in full with interest over a period of five (5) years from the Effective Date.  With respect to the sale of buildings or units in buildings other than the Warehouse Buildings, CJUF shall provide partial releases of its liens based upon the receipt of the release prices set forth on Exhibit 5.

Below is an aerial depiction of the Project.



A summary of the principal provisions of the Plan is set forth below.  This summary is qualified in its entirety by reference to the provisions of the Plan and, to the extent there is any conflict between this summary and the Plan, the language of the Plan will govern.  All terms stated in initial capital letters in this summary are defined in the Plan.

Claims and Equity Interests will be treated under the Plan in the manner set forth in Article 5 of the Plan.  Except as otherwise specifically provided in the Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan will be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests.

## TREATMENT OF ADMINISTRATIVE
## EXPENSES AND PRIORITY TAX CLAIMS

Claims and Equity Interests shall be treated under the Plan in the manner set forth in this Article 5.  Except as otherwise specifically provided in the Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests.

**Unclassified Claims.**

Holders of Allowed Administrative Expense Claims and Allowed Priority Tax Claims shall receive the treatment set forth in Article 3 of the Plan.

**Class 1:  Priority Claims.**

Class 1 consists of all Priority Claims.  Each Holder of an Allowed Priority Claim shall be paid (a) on the Distribution Date, an amount, in Cash, by the Reorganized Debtor equal to the Allowed Amount of its Priority Claim in accordance with Section 1129(a)(9)(B) of the Bankruptcy Code, or (b) under such other terms as may be agreed upon by both the Holder of such Allowed Priority Claim and the Debtor or the Reorganized Debtor.  Class 1 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Claim conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**Class 2:  All Allowed CJUF Prepetition Claims.**

Class 2 consists of all Allowed CJUF Prepetition Claims.

There shall be two options for CJUF with respect to the treatment of its Allowed CJUF Prepetition Claims:

**OPTION 1:**

Pursuant to Option 1, on or before the date that is ten days after the Effective Date, the Debtor shall transfer or cause to be transferred to CJUF or its designee the Project and the North Trail Property by deed in lieu of foreclosure or through a consent to foreclosure, at CJUF's option, in full satisfaction of the Allowed CJUF Prepetition Claims.

All litigation by CJUF against the Debtor and Roskamp shall be dismissed with prejudice. Under Option 1, Roskamp and the Debtor shall release and dismiss with prejudice all of the CJUF/BOA Causes of Action.

**OPTION 2:**

Pursuant to Option 2:

**Amount of Secured Claim**

The Allowed CJUF Prepetition Claims shall be paid in full, with payments beginning on the first day of the month following the Effective Date.

12

### Roskamp Contribution

Roskamp shall make the Roskamp Contribution to the Debtor as and when necessary to fund operations.

### Payment Terms

Beginning on the first day of the month following the Effective Date and continuing on the first day of each succeeding month for an additional eleven months (for a total of 12 months), the Debtor shall pay to CJUF interest-only payments calculated at five percent per annum (5%) (or such other rate as the Court deems fair and equitable).

Beginning on the first day of the thirteenth month following the Effective Date, the Debtor shall make payments of principal and interest at five percent per annum (5%) (or such other rate as the Court deems fair and equitable), amortized over thirty years (or such other term as the Court deems fair and equitable). The monthly payment amount shall be reamortized based on the unexpired term of the 360 month schedule in the event of a principal reduction caused by the payment of sale proceeds or otherwise. The Allowed CJUF Prepetition Claims shall mature and become due and payable on the first day of the 60th month after the Effective Date (the "**Maturity Date**") (or such other term as the Court deems to be fair and equitable).

On the Effective Date, the Debtor shall cause to be transferred to CJUF the North Trail Property by deed in lieu of foreclosure or by consent to foreclosure, at CJUF's option. In exchange for such transfer, the principal balance of the Allowed CJUF Prepetition Claims shall be reduced by $1 million.

### Retention of Lien, Sales of Collateral

CJUF shall retain its liens on all of its Collateral and on the rents and other proceeds generated therefrom.

Provided that the Debtor is not in monetary default under the CJUF Loan Documents, as amended by the Plan, the Debtor shall have the right to sell buildings 1723, 1750, 1755, 6265, and 6269 (collectively, the "**Warehouse Buildings**"), provided that the minimum release price to be paid to CJUF in exchange for a partial release of its Lien shall be the greater of 80% of the net sale proceeds (after deducting customary closing costs) or $30 per square foot sold.

Any of the Warehouse Buildings that are not sold on or before the date that is two years after the Effective Date shall be conveyed to CJUF through deed in lieu of foreclosure or consent to foreclosure, at CJUF's option, and the principal balance of the

13

Allowed CJUF Prepetition Claims shall be reduced by an amount equal to $30 per square foot multiplied by the total square footage of the Warehouse Buildings that are conveyed.

Moreover, provided that the Debtor is not in monetary default under the CJUF Loan Documents, as amended by the Plan, the Debtor shall have the right to: (i) sell one or more of buildings 6090, 6080, 6070, 6060, 6050, 6040, 6030, 6020, 6010, and 6000 as standalone buildings, each of which may be sold as members of a business condominium association in order to efficiently and effectively manage the common areas and elements; (ii) sell building 6500 (A-E) as a standalone building; (iii) either convert buildings 6350, 6320, 6290, 6270, 1756, and 1710 into multiple business condominium units and sell each of the units, or sell buildings 6350, 6320, 6290, 6270, 1756, and 1710 as standalone buildings, each of which may be sold as members of a business condominium association in order to efficiently and effectively manage the common areas and elements. With respect to the potential sales described in this paragraph, CJUF shall provide a partial release of Lien in exchange for payment of the per square footage release prices set forth in the schedule attached hereto as **Exhibit C**.

### Default

The Debtor/Reorganized Debtor shall be in default upon the occurrence of the following: A failure to make payments under the Plan when due, failure to maintain insurance, failure to pay *ad valorem* real estate taxes when due, a failure to provide the following financial reporting on a quarterly basis: statements of operations and a rent roll, within 45 days of the end of each quarter, and on an annual basis, statements of operations and a rent roll within sixty days of the end of each calendar year; failure to allow reasonable inspections of the Project upon reasonable advance notice, and a failure to allow audits as required under the CJUF Prepetition Loan Documents upon reasonable advance notice. The Debtor/Reorganized Debtor shall have thirty (30) days from the written notice of default to cure any default. All other covenants and default provisions shall be eliminated from the CJUF Loan Documents.

The Debtor shall place a deed in lieu of foreclosure in escrow with an attorney chosen by CJUF and approved by the Debtor. Such deed shall not be released unless an uncured default occurs under the Plan. In order to reduce risk for CJUF, in the event of a default that is not timely cured, the Debtor will not contest the release of the deed in lieu of foreclosure or, alternatively, will consent to foreclosure in the event that CJUF elects to foreclose.

The Debtor/Reorganized Debtor further agrees to not file a subsequent bankruptcy case in the event of a monetary default that is not timely cured and if a subsequent bankruptcy case is filed, CJUF will be entitled to relief from stay in connection with that new bankruptcy case.

Any litigation against the Debtor and Roskamp by CJUF shall be dismissed.

Upon payment in full pursuant to the terms of the Plan, CJUF shall release its liens against its Collateral.

All of the CJUF/BOA Causes of Action shall be preserved.

The Debtor shall have the option to record the Condo Documents.

Notwithstanding the above, CJUF may be paid under such other terms as may be agreed upon by CJUF and the Debtor or the Reorganized Debtor, as the case may be.

Option 2 shall only be triggered if CJUF timely votes against or timely objects to the Plan on or before the applicable deadlines under the Disclosure Statement Approval Order.  Otherwise, the Debtor shall proceed with Option 1 at the Confirmation Hearing.

Class 2 is Impaired by the Plan.  CJUF, as the Holder of the Class 2 Claims, is entitled to vote to accept or reject the Plan.

**Class 3: Secured Tax Claims of Governmental Units or Tax Certificate Holders.**

Class 3 consists of all Secured Tax Claims of Governmental Units or Tax Certificate Holders.  Each Holder of an Allowed Secured Tax Claim shall be paid (a) in equal quarterly installments commencing on the first day of the calendar quarter following the quarter in which the Effective Date of the Plan occurs, and each calendar quarter thereafter, which payments will result in the Allowed Secured Tax Claims being paid on the date that is five (5) years following the Petition Date, with an interest rate equal to the interest rate in effect pursuant to applicable non-bankruptcy law, or (b) under such other terms as may be agreed upon by both the Holder of such Allowed Secured Tax Claim and the Debtor.  Class 3 is Impaired by the Plan.  Each Holder of a Class 3 Claim is entitled to vote to accept or reject the Plan.

**Class 4:  Unsecured Claims (Unsecured Claims Not Otherwise Classified).**

Class 4 consists of all Unsecured Claims not otherwise classified in the Plan.

If Option 2 applies to the treatment of the Allowed GCUF Prepetition Claims in Class 2, each Holder of an Allowed Unsecured Claim shall be paid in equal quarterly installments commencing on the first day of the third month of the calendar quarter following the quarter in which the Effective Date of the Plan occurs, and each calendar quarter thereafter, which payments will result in the Allowed Unsecured Claims being

paid in full with interest at 5% per annum on or before the date that is five (5) years after the Effective Date.

Alternatively, if Option 1 applies to the treatment of the Allowed GCUF Prepetition Claims in Class 2, Roskamp shall make the payments to Holders of Allowed Unsecured Claims on the terms as described in the preceding paragraph.

Class 4 is Impaired by the Plan. Each Holder of a Class 4 Claim is entitled to vote to accept or reject the Plan.

**Class 5:  Secured Claims of Kaltenbacher.**

Class 5 consists of the Secured Claims of Kaltenbacher.

Kaltenbacher's claims under the Payment Agreement shall be capped at $2.5 million. Kaltenbacher shall retain his Lien against the Project; provided, however, Kaltenbacher's sole right of recovery from the Debtor shall be as to any net cash remaining in the Debtor's bank account after satisfaction of all of the Debtor's monetary obligations under the Plan (except those with respect to Class 6) or any remaining Collateral subject to Kaltenbacher's Lien after satisfaction of all of the Debtor's monetary obligations under the Plan (except those with respect to Class 6). Kaltenbacher shall not be entitled to exercise any other remedies against the Debtor.

Kaltenbacher shall execute any lien releases as necessary to facilitate sales or a refinancing.

Class 5 is Impaired by the Plan. Kaltenbacher is entitled to vote to accept or reject the Plan.

**Class 6:  Equity Interests.**

Class 6 consists of all Equity Interests. The Equity Interests will not be affected by the Plan and the Member will retain the Equity Interests. No Distributions will be made under the Plan on account of the Equity Interests unless and until all senior classes are paid in full. Class 6 is Unimpaired by the Plan. The Member, as the Holder of the Class 6 Equity Interests, conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

## ACCEPTANCE OR REJECTION OF THE PLAN

### Each Impaired Class Entitled to Vote Separately.

Except as otherwise provided in Article 6.4, the Holders of Claims or Equity Interests in each Impaired Class of Claims or Impaired Class of Equity Interests shall be entitled to vote separately to accept or reject the Plan.

### Acceptance by Impaired Classes.

Classes 2, 3, 4, and 5 are Impaired under the Plan, and Holders of Claims in such Classes are entitled to vote to accept or reject the Plan.  Pursuant to Section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  If a Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims in such Class voting on the Plan.  Pursuant to Section 1126(d) of the Bankruptcy Code, an Impaired Class of Equity Interests shall have accepted the Plan if the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Equity Interests actually voting in such Class have voted to accept the Plan.

### Presumed Acceptance of Plan by Unimpaired Classes.

Classes 1 and 6 are Unimpaired under the Plan.  Pursuant to Section 1126(f) of the Bankruptcy Code, such Classes and the Holders of Claims in such Classes are conclusively presumed to have accepted the Plan and, thus, are not entitled to vote on the Plan.  Accordingly, votes of Holders of Claims in Classes 1 and 6 are not being solicited by the Debtor.  Except as otherwise expressly provided in the Plan, nothing contained herein or otherwise shall affect the rights and legal and equitable claims or defenses of the Debtor or the Reorganized Debtor in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

### Impairment Controversies.

If a controversy arises as to whether any Claim or Equity Interest, or any Class of Claims or Class of Equity Interests, is Impaired under the Plan, such Claim, Equity

Interest or Class shall be treated as specified in the Plan unless the Bankruptcy Court shall determine such controversy upon motion of the party challenging the characterization of a particular Claim or Equity Interest, or a particular Class of Claims or Class of Equity Interests, under the Plan.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### Assumption or Rejection of Executory Contracts and Unexpired Leases.

Pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, (i) all executory contracts and unexpired leases that currently exist between the Debtor and another Person or Entity and that are listed on Exhibit A attached hereto shall be deemed assumed by the Debtor as of the Effective Date, and (ii) all other executory contracts and unexpired leases that currently exist between the Debtor and another Person or Entity and that are not listed on Exhibit B attached hereto shall be deemed assumed by the Debtor as of the Effective Date (collectively, the "**Assumed Contracts**"); provided, however, that the Debtor reserves the right, on or prior to the Confirmation Date, to amend Exhibit B to add any executory contract or unexpired lease thereto or to delete any executory contract or unexpired lease therefrom, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be rejected (if added) or assumed (if deleted). The Debtor shall provide notice of any amendments to Exhibit A or B to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Exhibit A or B shall not constitute an admission by the Debtor that such document is an executory contract or an unexpired lease or that the Debtor has any liability thereunder. Any executory contract or unexpired lease that exists between the Debtor and another Person or Entity and that is listed on Exhibit B attached to the Plan shall be deemed rejected by the Debtor as of the Confirmation Date (collectively, the "**Rejected Contracts**"), unless there is pending before the Bankruptcy Court on the Confirmation Date a motion to assume such executory contract or unexpired lease. For purposes of the Plan, (i) all non-compete agreements, confidentiality or non-disclosure agreements and indemnification agreements executed for the benefit of the Debtor shall be deemed to be executory contracts and Assumed Contracts, and (ii) all non-compete agreements, confidentiality or non-disclosure agreements, indemnification agreements and guaranties executed by the Debtor for the benefit of a third party shall be deemed to be executory contracts and Rejected Contracts (even if not listed on Exhibit B).

### Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Article 7.1 hereof, (ii) the approval, pursuant to Sections 365(a) and

1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Article 7.1 hereof, and (iii) the extension of time, pursuant to Section 365(d)(4) of the Bankruptcy Code, within which the Debtor may assume, assume and assign, or reject any unexpired lease of nonresidential real property through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired lease.  The assumption by the Debtor of an Assumed Contract shall be binding upon any and all parties to such Assumed Contract as a matter of law, and each such Assumed Contract shall be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan or an order of the Bankruptcy Court.

**Inclusiveness.**

Unless otherwise specified on Exhibit A or Exhibit B, each executory contract and unexpired lease listed or to be listed on Exhibit A or Exhibit B shall include all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Exhibit A or Exhibit B.

**Cure of Defaults.**

Any lessor, lessee, or other party to an Assumed Contract (except those lessors, lessees, or other parties whose unexpired leases or executory contracts have been previously assumed by a Final Order of the Bankruptcy Court) asserting a Cure Claim in connection with the assumption of any unexpired lease or executory contract under Article 7.1, as contemplated by Section 365(b) of the Bankruptcy Code, must file such Cure Claim with the Bankruptcy Court on or before the Cure Claim Submission Deadline asserting all alleged amounts accrued or alleged defaults through the Effective Date.  Any lessor or other party to an Assumed Contract failing to file a Cure Claim by the Cure Claim Submission Deadline shall be forever barred from asserting, collecting or seeking to collect any amounts or defaults relating thereto against the Debtor or the Reorganized Debtor.  The Reorganized Debtor shall have ninety (90) days from the Effective Date to file an objection to any Cure Claim.  Any disputed Cure Claims shall be resolved either consensually or by the Bankruptcy Court. Except as may otherwise be agreed to by the parties, by no later than one hundred eighty (180) days following the Effective Date, the Reorganized Debtor shall cure any and all undisputed Cure Claims. All disputed Cure Claims shall be cured either within one hundred twenty (120) days after the entry of a Final Order determining the amount, if any, of the Debtor's liability with respect thereto or as may otherwise be agreed to by the parties.  As of the date of the Plan, the Debtor does not believe there will be any Cure Claims.

**Claims under Rejected Executory Contracts and Unexpired Leases.**

Unless otherwise ordered by the Bankruptcy Court, any Claim for damages arising by reason of the rejection of any executory contract or unexpired lease must be filed with the Bankruptcy Court on or before the Bar Date for rejection damage Claims in respect of such rejected executory contract or unexpired lease or such Claim shall be forever barred and unenforceable against the Debtor or the Reorganized Debtor.  With respect to the Rejected Contracts, the Bar Date for filing rejection damage and other Claims with the Bankruptcy Court shall be thirty (30) days after the Confirmation Date. The Plan and any other order of the Bankruptcy Court providing for the rejection of an executory contract or unexpired lease shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the Bar Date for filing a Claim in connection therewith.

All Claims for damages from the rejection of an executory contract or unexpired lease, once fixed and liquidated by the Bankruptcy Court and determined to be Allowed Claims, shall be Allowed Unsecured Claims in Class 4.

**Insurance Policies.**

All of the Debtor's insurance policies and any agreements, documents, or instruments relating thereto are treated as executory contracts under the Plan.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or the Reorganized Debtor may hold against any Person or Entity, including the insurers under any of the Debtor's insurance policies.

**Indemnification Rights.**

All Claims for Indemnification Rights against the Debtor by an Indemnitee for defense and indemnification shall be reinstated against the Reorganized Debtor and rendered Unimpaired to the extent that such Indemnitee is entitled to defense or indemnification under applicable law, agreement or past policy of the Debtor, but only to the extent that any such reinstated Claim for defense and indemnification in response to a claim against such Indemnitee is covered under any of the Debtor's insurance policies. The reinstated Claim against the Reorganized Debtor, and the Reorganized Debtor's corresponding defense and indemnification obligation, shall not be for any deductible or self-insured retention amount and shall not exceed the amount of available insurance coverage.

## MEANS OF IMPLEMENTATION OF THE PLAN

**General Overview of the Plan.**

The Plan generally provides for one of the following two options:

(i)  The Debtor will transfer the Project and the North Trail Property to CJUF in full settlement and satisfaction of the Allowed GCUF Prepetition Claims, and Roskamp will pay Allowed Unsecured Claims in full with interest over a period of five (5) years from the Effective Date; **or**

(ii)  The Debtor will:  retain the Project, stabilize occupancy, rental rates, and rental revenues; sell buildings 1723, 1750, 1755, 6265, 6269 (the "**Warehouse Buildings**") at a release price equal to the greater of 80 percent of the net sale proceeds (after deducting customary closing costs) or $30 per square foot, within two (2) years of the Effective Date or transfer the Warehouse Buildings to CJUF in exchange for a thirty dollar ($30.00) per square foot reduction of the principal balance of the Allowed CJUF Prepetition Claims; and pay Allowed Unsecured Claims in full with interest over a period of five (5) years from the Effective Date.  If the Debtor retains the Project, at the Debtor's sole option, the Debtor may also: (i) sell one or more of buildings 6090, 6080, 6070, 6060, 6050, 6040, 6030, 6020, 6010, and 6000 as standalone buildings, each of which may be sold as members of a business condominium association in order to efficiently and effectively manage the common areas and elements; (ii) sell building 6500 (A-E) as a standalone building; (iii) either convert buildings 6350, 6320, 6290, 6270, 1756, and 1710 into multiple business condominium units and sell each of the units, or sell buildings 6350, 6320, 6290, 6270, 1756, and 1710 as standalone buildings, each of which may be sold as members of a business condominium association in order to efficiently and effectively manage the common areas and elements; (iv) pay the Allowed CJUF Prepetition Claims in full with interest over a period of five (5) years from the Effective Date; and (v) pay Allowed Unsecured Claims in full with interest over a period of five (5) years from the Effective Date.  With respect to the sale of buildings or units in buildings other than the Warehouse Buildings, CJUF shall provide partial releases of its liens based upon the receipt of the per square footage release prices set forth on Exhibit C.

**Effective Date Actions.**

Subject to the approval of the Bankruptcy Court and the satisfaction or waiver of the conditions precedent to the occurrence of the Effective Date contained in Article 10.2

21

of the Plan, on or as of the Effective Date, the Plan shall be implemented and the following actions shall thereafter occur on or before the date that is ten days after the Effective Date:

> (1)    the Reorganized Debtor shall make the Initial Distribution as provided in Article 9.1 of the Plan; and
>
> (2)    If Option 1 is implicated for the treatment of Class 2, the Debtor shall execute the deed in lieu of foreclosure or the consent to foreclosure, at the option of CJUF.

**Vesting of Property of the Estate in the Reorganized Debtor.**

On the Effective Date, except as otherwise expressly provided in the Plan, all Property of the Estate (including the Causes of Action and any net operating losses) shall vest in the Reorganized Debtor free and clear of any and all Liens, Debts, obligations, Claims, Cure Claims, Liabilities, Equity Interests, and all other interests of every kind and nature, and the Confirmation Order shall so provide.  The Reorganized Debtor intends to preserve net operating losses to the maximum extent permitted under applicable law.  As of the Effective Date, the Reorganized Debtor may operate its business and use, acquire, and dispose of its Properties, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.   All privileges with respect to the Property of the Debtor's Estate, including the attorney/client privilege, to which the Debtor is entitled shall automatically vest in, and may be asserted by or waived on behalf of, the Reorganized Debtor.

**Continued Corporate Existence; Dissolution.**

The Debtor will continue to exist after the Effective Date as a separate corporate entity, with all of the powers of a limited liability company under Florida Law and pursuant to its organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended or amended and restated as provided in the Plan or the Confirmation Order, without prejudice to any right to terminate such existence (whether by merger, dissolution or otherwise) under applicable law after the Effective Date.

**Corporate Action.**

All matters provided for under the Plan involving the corporate structure of the Debtor or the Reorganized Debtor, or any corporate action to be taken by or required of the Debtor or the Reorganized Debtor shall, as of the Effective Date, be deemed to have

22

occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the Member and Manager of the Debtor or the Reorganized Debtor.

**Management of the Reorganized Debtor.**

Subject to any requirement of Bankruptcy Court approval pursuant to Section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, Seminole Properties, the sole member of the Debtor immediately prior to the Effective Date, shall be deemed to be the sole member of the Reorganized Debtor without any further action by any party. Robert G. Roskamp shall be the sole manager of the Reorganized Debtor on and after the Effective Date.

On the Effective Date, in the event that Option 2 for the treatment of Class 2 is implicated, the Receiver shall be removed and the Debtor shall manage the Project. On and after the Effective Date, the operations of the Reorganized Debtor shall continue to be the overall responsibility of Robert G. Roskamp.

From and after the Confirmation Date, the Manager shall have all powers accorded by law to put into effect and carry out the Plan and the Confirmation Order on behalf of the Reorganized Debtor.

**Section 1146 Exemption.**

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, distribution, transfer or exchange of any Security, or the making, delivery or recording of any instrument of transfer, pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or the vesting, re-vesting, transfer or sale of any Property of, by or in the Debtor or its Estate or the Reorganized Debtor pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or any transaction arising out of, contemplated by or in any way related to the foregoing, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangible or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall be, and hereby are, directed to forego the collection of any such tax or governmental assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**Pursuit of Causes of Action.**

On the Effective Date, the Causes of Action shall be vested in the Reorganized Debtor, except to the extent a Creditor or other third party has been specifically released

from any Cause of Action by the terms of the Plan or by a Final Order of the Bankruptcy Court.  Reorganized Debtor will have the right, in its sole and absolute discretion, to pursue, not pursue, settle, release or enforce any Causes of Action without seeking any approval from the Bankruptcy Court except as provided in Article 8.13.  The Debtor is currently not in a position to express an opinion on the merits of any of the Causes of Action or on the recoverability of any amounts as a result of any such Causes of Action. For purposes of providing notice, the Debtor states that any party in interest that engaged in business or other transactions with the Debtor Prepetition or that received payments from the Debtor Prepetition may be subject to litigation to the extent that applicable bankruptcy or non-bankruptcy law supports such litigation.  The Reorganized Debtor will fund the costs and expenses (including legal fees) to pursue the Causes of Action.

No Creditor or other party should vote for the Plan or otherwise rely on the Confirmation of the Plan or the entry of the Confirmation Order in order to obtain, or on the belief that it will obtain, any defense to any Cause of Action.  No Creditor or other party should act or refrain from acting on the belief that it will obtain any defense to any Cause of Action.  ADDITIONALLY, THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY CAUSES OF ACTION OR OBJECTIONS TO CLAIMS, AND ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED IN FAVOR OF REORGANIZED DEBTOR.  Creditors are advised that legal rights, claims and rights of action the Debtor may have against them, if they exist, are retained under the Plan for prosecution unless a Final Order of the Bankruptcy Court authorizes the Debtor to release such claims.  As such, Creditors are cautioned not to rely on (i) the absence of the listing of any legal right, claim or right of action against a particular Creditor in the Disclosure Statement, the Plan, or the Schedules, or (ii) the absence of litigation or demand prior to the Effective Date of the Plan as any indication that the Debtor or Reorganized Debtor does not possess or does not intend to prosecute a particular claim or Cause of Action if a particular Creditor votes to accept the Plan.  It is the expressed intention of the Plan to preserve rights, objections to Claims, and rights of action of the Debtor, whether now known or unknown, for the benefit of the Reorganized Debtor.  A Cause of Action shall not, under any circumstances, be waived as a result of the failure of the Debtor to describe such Cause of Action with specificity in the Plan or in the Disclosure Statement; nor shall the Reorganized Debtor, as a result of such failure, be estopped or precluded under any theory from pursuing such Cause of Action.  Except as set forth in Article 5, nothing in the Plan operates as a release of any of the Causes of Action.

The Debtor does not presently know the full extent of the Causes of Action and, for purposes of voting on the Plan, all Creditors are advised that Reorganized Debtor will have substantially the same rights that a Chapter 7 trustee would have with respect to the Causes of Action.  Accordingly, neither a vote to accept the Plan by any Creditor nor the entry of the Confirmation Order will act as a release, waiver, bar or estoppel of any Cause of Action against such Creditor or any other Person or Entity, unless such Creditor, Person or Entity is specifically identified by name as a released party in the Plan, in the

Confirmation Order, or in any other Final Order of the Bankruptcy Court. Confirmation of the Plan and entry of the Confirmation Order is not intended to and shall not be deemed to have any *res judicata* or collateral estoppel or other preclusive effect that would precede, preclude, or inhibit prosecution of such Causes of Action following Confirmation of the Plan.

At this time, the Debtor believes the Causes of Action consist primarily of the Avoidance Actions and the CJUF/BOA Causes of Action, all of which are preserved, except as otherwise released under Article 5 of the Plan.

The Debtor and the Reorganized Debtor reserve all rights under Section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims.

**<u>Prosecution and Settlement of Claims and Causes of Action</u>.**

The Reorganized Debtor (a) may commence or continue in any appropriate court or tribunal any suit or other proceeding for the enforcement of any Cause of Action which the Debtor had or had power to assert immediately prior to the Effective Date, and (b) may settle or adjust such Cause of Action. From and after the Effective Date, the Reorganized Debtor shall be authorized, pursuant to Bankruptcy Rule 9019 and Section 105(a) of the Bankruptcy Code, to compromise and settle any Cause of Action or objection to a Claim in accordance with the following procedures, which shall constitute sufficient notice in accordance with the Bankruptcy Code and the Bankruptcy Rules for compromises and settlements: (i) if the resulting settlement provides for settlement of a Cause of Action or objection to a Claim originally asserted in an amount equal to or less than $25,000.00, then the Reorganized Debtor may settle the Cause of Action or objection to Claim and execute necessary documents, including a stipulation of settlement or release, subject to notifying the United States Trustee and the Notice Parties of the terms of the settlement agreement; provided, however, that if the United States Trustee or the Notice Parties indicate their approval or do not provide the Reorganized Debtor with an objection to the proposed settlement within ten (10) days after it receives notice of such settlement in writing, then the Reorganized Debtor shall be authorized to accept and consummate the settlement; and provided further, however, that if a timely written objection is made by the United States Trustee or the Notice Parties to the proposed settlement, then the settlement may not be consummated without approval of the Bankruptcy Court in accordance with Bankruptcy Rule 9019; and (ii) if the resulting settlement involves a Cause of Action or objection to a Claim originally asserted in an amount exceeding $25,000.00, then the Reorganized Debtor shall be authorized and empowered to settle such Cause of Action or objection to Claim only upon Bankruptcy Court approval in accordance with Bankruptcy Rule 9019 and after notice to the Notice Parties.

**Effectuating Documents; Further Transactions.**

Prior to the Effective Date, each of the chief executive officer, president, chief financial officer, or secretary of the Debtor (and, on and after the Effective Date, each of the chief executive officer, president, chief financial officer, or secretary of the Reorganized Debtor) shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, mortgages, and other agreements or documents and take such actions as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan or to otherwise comply with applicable law.

## PROVISIONS GOVERNING DISTRIBUTIONS

**Initial Distribution.**

As soon as reasonably practicable (as determined by the Reorganized Debtor) after the Effective Date, the Reorganized Debtor shall make the Distributions required under the Plan to Holders of Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals) and Allowed Claims in Class 1 (the "**Initial Distribution**").   Thereafter, the Reorganized Debtor shall make additional Distributions to Holders of Allowed Claims as and when required by the terms of the Plan.

**Determination of Claims.**

From and after the Effective Date, the Reorganized Debtor shall have the exclusive authority to, and shall, file, settle, compromise, withdraw, or litigate to judgment all objections to Claims.   Except as to any late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases, if any, all objections to Claims shall be filed with the Bankruptcy Court by no later than ninety (90) days following the Effective Date (unless such period is extended by the Bankruptcy Court upon motion of the Debtor or Reorganized Debtor), and the Confirmation Order shall contain appropriate language to that effect. Holders of Unsecured Claims that have not filed such Claims on or before the Bar Date shall serve the Notice Parties with any request to the Bankruptcy Court for allowance to file late Unsecured Claims.   If the Bankruptcy Court grants the request to file a late Unsecured Claim, such Unsecured Claim shall be treated in all respects as a Class 5 Unsecured Claim. Objections to late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases shall be filed on the later of (a) ninety (90) days following the Effective Date or (b) the date sixty (60) days after Reorganized Debtor receives actual notice of the filing of such Claim.

Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtor or Reorganized Debtor, as the case may be, effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for the Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto, or (c) by first class mail, postage prepaid, on any counsel that has filed a notice of appearance in the Bankruptcy Case on behalf of the Holder of a Claim.

Disputed Claims shall be fixed or liquidated in the Bankruptcy Court as core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(B) unless the Bankruptcy Court orders otherwise. If the fixing or liquidation of a contingent or unliquidated Claim would cause undue delay in the administration of the Bankruptcy Case, such Claim shall be estimated by the Bankruptcy Court for purposes of allowance and Distribution. The Debtor or Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtor or Reorganized Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor or Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim. The determination of Claims in Estimation Hearings shall be binding for purposes of establishing the maximum amount of the Claim for purposes of allowance and Distribution. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Procedures for specific Estimation Hearings, including provisions for discovery, shall be set by the Bankruptcy Court giving due consideration to applicable Bankruptcy Rules and the need for prompt determination of the Disputed Claim.

**Distributions as to Allowed Claims in Class 4.**

Each Holder of an Allowed Unsecured Claim in Class 4 shall receive a Cash Distribution, on the applicable Distribution Date, in the amount provided for in Article 5 of the Plan.

Notwithstanding any provision herein to the contrary, no Distribution shall be made to the Holder of a Disputed Claim in Class 4 unless and until such Disputed Claim becomes

an Allowed Claim.  At such time that such Disputed Claim becomes an Allowed Class 5 Claim, the Holder of such Allowed Class 4 Claim shall receive the Distribution to which such Holder is then entitled under the Plan.

Notwithstanding any provision herein to the contrary, if, on any applicable Distribution Date, the Holder of a Class 4 Claim is subject to a proceeding against it by Reorganized Debtor under Section 502(d) of the Bankruptcy Code, then Reorganized Debtor (in its sole discretion) may withhold a Distribution to such Holder until the final resolution of such proceeding.

Distributions to a Holder of an Allowed Claim in Class 4 shall be made at the address of such Holder set forth in the Schedules or on the books and records of the Debtor or Reorganized Debtor at the time of the Distribution, unless Reorganized Debtor has been notified in writing of a change of address, including by the filing of a Proof of Claim or statement pursuant to Bankruptcy Rule 3003 by such Holder that contains an address for such Holder different than the address for such Holder as set forth in the Schedules. Reorganized Debtor shall not be liable for any Distribution sent to the address of record of a Holder in the absence of the written change thereof as provided herein.

**Unclaimed Distributions.**

If the Holder of an Allowed Claim fails to negotiate a check for a Distribution issued to such Holder within sixty (60) days of the date such check was issued, then Reorganized Debtor shall provide written notice to such Holder stating that, unless such Holder negotiates such check within thirty (30) days of the date of such notice, the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim.

If a check for a Distribution made pursuant to the Plan to any Holder of an Allowed Claim is returned to Reorganized Debtor due to an incorrect or incomplete address for the Holder of such Allowed Claim, and no claim is made in writing to Reorganized Debtor as to such check within sixty (60) days of the date such Distribution was made, then the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim.

Any unclaimed Distribution as described above sent by Reorganized Debtor shall become the property of Reorganized Debtor.

28

**Transfer of Claim.**

In the event that the Holder of any Claim shall transfer such Claim on and after the Effective Date, such Holder shall immediately advise Reorganized Debtor in writing of such transfer and provide sufficient written evidence of such transfer. Reorganized Debtor shall be entitled to assume that no transfer of any Claim has been made by any Holder unless and until Reorganized Debtor shall have received written notice to the contrary. Each transferee of any Claim shall take such Claim subject to the provisions of the Plan and to any request made, waiver or consent given or other action taken hereunder and, except as otherwise expressly provided in such notice, Reorganized Debtor shall be entitled to assume conclusively that the transferee named in such notice shall thereafter be vested with all rights and powers of the transferor under the Plan.

**One Distribution Per Holder.**

If the Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of Distribution hereunder, and only one Distribution shall be made with respect to the single aggregated Claim.

**Effect of Pre-Confirmation Distributions.**

Nothing in the Plan shall be deemed to entitle the Holder of a Claim that received, prior to the Effective Date, full or partial payment of such Holder's Claim, by way of settlement or otherwise, pursuant to an order of the Bankruptcy Court, provision of the Bankruptcy Code, or other means, to receive a duplicate payment in full or in part pursuant to the Plan; and all such full or partial payments shall be deemed to be payments made under the Plan for purposes of satisfying the obligations of the Debtor or Reorganized Debtor to such Holder under the Plan.

**No Interest on Claims.**

Except as expressly stated in the Plan or otherwise Allowed by a Final Order of the Bankruptcy Court, no Holder of an Allowed Claim shall be entitled to the accrual of Postpetition Interest or the payment of Postpetition Interest, penalties, or late charges on account of such Allowed Claim for any purpose. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a Disputed Claim becomes an Allowed Claim.

**Compliance with Tax Requirements.**

In connection with the Plan, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed by federal, state, local and foreign

29

taxing authorities, and all Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution.

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE

**Conditions Precedent to Confirmation of the Plan.**

The following are conditions precedent to Confirmation of the Plan, each of which may be waived by the Debtor:

The Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order in a manner consistent with the provisions of the Plan.

**Conditions Precedent to the Effective Date.**

The Plan shall not be consummated and the Effective Date shall not occur unless each of the following conditions has been satisfied following the Confirmation Date or waived by the Debtor:

The Confirmation Order shall be a Final Order, in form and substance satisfactory to the Debtor.

**Notice of the Effective Date.**

Promptly following the satisfaction, or the waiver by the Debtor, of all of the conditions set forth in Article 10.2, the Debtor shall file a notice (the "**Effective Date Notice**") with the Bankruptcy Court designating the Effective Date.  The Debtor shall serve the Effective Date Notice on all of the Notice Parties.

## DISCHARGE, EXCULPATION FROM LIABILITY, RELEASE,
## AND GENERAL INJUNCTION

**Discharge of Claims.**

Except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall operate as a discharge, pursuant to Section 1141(d) of the Bankruptcy Code, to the fullest extent permitted by applicable law, as of the Effective Date, of the Debtor and its Estate and the Reorganized Debtor from any and all Debts of and Claims of any nature whatsoever against the Debtor that arose at any time prior to the Effective Date, including any and all Claims for principal and interest, whether accrued before, on or after the Petition Date. Except as otherwise expressly provided in the Plan or in the Confirmation Order, but without limiting the generality of the foregoing, on the Effective Date, the Debtor and its Estate and the Reorganized Debtor, and their respective successors or assigns, shall be discharged, to the fullest extent permitted by applicable law, from any Claim or Debt that arose prior to the Effective Date and from any and all Debts of the kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such Debt was filed pursuant to Section 501 of the Bankruptcy Code, (b) a Claim based on such Debt is an Allowed Claim pursuant to Section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based on such Debt has voted to accept the Plan. As of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons and Entities, including all Holders of Claims or Equity Interests, shall be forever precluded and permanently enjoined to the fullest extent permitted by applicable law from asserting directly or indirectly against the Debtor or its Estate or the Reorganized Debtor, or any of their respective successors and assigns, or the assets or Properties of any of them, any other or further Claims, Debts, rights, causes of action, remedies, or Liabilities based upon any act, omission, document, instrument, transaction, event, or other activity of any kind or nature that occurred prior to the Effective Date or that occurs in connection with implementation of the Plan, and the Confirmation Order shall contain appropriate injunctive language to that effect. As of the Effective Date, Holders of Equity Interests shall have no rights arising from or relating to such Equity Interests, except as otherwise expressly provided in the Plan. In accordance with the foregoing, except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall be a judicial determination of the discharge or termination of all such Claims and other Debts and Liabilities against the Debtor, pursuant to Sections 524 and 1141 of the Bankruptcy Code, to the fullest extent permitted by applicable law, and such discharge shall void any judgment obtained against the Debtor, at any time, to the extent that such judgment relates to a discharged or terminated Claim, Liability, or Debt. Notwithstanding the foregoing, Reorganized Debtor shall remain obligated to make payments to Holders of Allowed Claims as required pursuant to the Plan.

31

**Exculpation from Liability.**

**The Debtor and its respective Postpetition officers, the Manager, Member, and the Professionals for the Debtor (acting in such capacity) (collectively, the "Exculpated Parties") shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, any Plan Document, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Bankruptcy Case, in each case for the period on and after the Petition Date and through the Effective Date; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. With respect to Professionals, the foregoing exculpation from liability provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Bankruptcy Case. Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy. The rights granted under this Article 11.2 are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law. In furtherance of the foregoing, the Exculpated Parties shall have the fullest protection afforded under Section 1125(e) of the Bankruptcy Code and all applicable law from liability for violation of any applicable law, rule or regulation governing the solicitation of acceptance or rejection of a plan. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of this Article 11.2 shall not release, or be deemed a release of, any of the Causes of Action.**

**General Injunction.**

Pursuant to Sections 105, 1123, 1129 and 1141 of the Bankruptcy Code, in order to preserve and implement the various transactions contemplated by and provided for in the Plan, as of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or Entities that have held, currently hold or may hold a Claim, Debt, or Liability that is discharged or terminated pursuant to the terms of the Plan are and shall be permanently enjoined and forever barred to the fullest extent permitted by law from taking any of the following actions on account of any such discharged or terminated Claims, Debts, or Liabilities, other than actions brought to enforce any rights or obligations under the Plan: (a) commencing or continuing in any manner any action or other proceeding against the Debtor or the Reorganized Debtor or their respective Properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor or the Reorganized

Debtor or their respective Properties; (c) creating, perfecting or enforcing any Lien or encumbrance against the Debtor or the Reorganized Debtor or their respective Properties; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor or the Reorganized Debtor; (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order; or (f) interfering with or in any manner whatsoever disturbing the rights and remedies of the Debtor or the Reorganized Debtor under the Plan and the other documents executed in connection therewith.  The Debtor and the Reorganized Debtor shall have the right to independently seek enforcement of this general injunction provision.  This general injunction provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of this Article 11.3 shall not release, or be deemed a release of, any of the Causes of Action.

**Injunction/Standstill of Action against Roskamp.**

**In the event that Option 2 is implicated for the treatment of Class 2, provided that the Reorganized Debtor is not in default of payments due to CJUF under the Plan, in exchange for the Roskamp Contribution and other consideration, CJUF shall be enjoined and barred from taking any of the following actions:  (a) commencing or continuing in any manner any action or other proceeding against Roskamp; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against Roskamp; (c) creating, perfecting or enforcing any Lien or encumbrance against Roskamp; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to Roskamp; (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order; or (f) interfering with or in any manner whatsoever disturbing the rights and remedies of Roskamp.  The injunction shall dissolve in the event that the Reorganized Debtor defaults on the payments set forth in Article 5 in the event that Option 2 is implicated, including any monthly payment or the final balloon payment due on the Maturity Date.  On the Effective Date, all actions against the Debtor and Roskamp shall be dismissed.  The Debtor and Roskamp shall have the right to independently seek enforcement of this injunction provision.  This injunction provision is an integral part of the Plan and is essential to its implementation.  Indeed, the payment of the Roskamp Contribution is contingent upon the enforceability of the injunction set forth herein.**

**Notwithstanding anything to the contrary, the intent of this Article 11.4 is to provide relief consistent with and limited to the type granted in the case of *In re Shaw Aero Devices, Inc.*, 283 B.R. 349 (Bankr. M.D. Fla. 2002), and this provision shall be interpreted consistent with such case.**

**In the event that Option 1 is implicated for the treatment of Class 2, in exchange for the transfer of the North Trail Property and the Project, all actions against the Debtor and Roskamp shall be dismissed with prejudice.**

**Term of Certain Injunctions and Automatic Stay.**

All injunctions or automatic stays for the benefit of the Debtor pursuant to Sections 105, 362 or other applicable provisions of the Bankruptcy Code, or otherwise provided for in the Bankruptcy Case, and in existence on the Confirmation Date, shall remain in full force and effect following the Confirmation Date and until the Final Decree Date, unless otherwise ordered by the Bankruptcy Court.

With respect to all lawsuits pending in courts in any jurisdiction (other than the Bankruptcy Court) that seek to establish the Debtor' liability on Prepetition Claims asserted therein and that are stayed pursuant to Section 362 of the Bankruptcy Code, such lawsuits shall be deemed dismissed as of the Effective Date, unless the Debtor affirmatively elects to have the Debtor's liability established by such other courts, and any pending motions seeking relief from the automatic stay for purposes of continuing any such lawsuits in such other courts shall be deemed denied as of the Effective Date, and the automatic stay shall continue in effect, unless the Debtor affirmatively elects to have the automatic stay lifted and to have the Debtor's liability established by such other courts; and the Prepetition Claims at issue in such lawsuits shall be determined and either Allowed or disallowed in whole or part by the Bankruptcy Court pursuant to the applicable provisions of the Plan, unless otherwise elected by the Debtor as provided herein.

**No Liability for Tax Claims.**

Unless a taxing Governmental Unit has asserted a Claim against the Debtor before the Governmental Unit Bar Date or Administrative Expense Claim Bar Date established therefor, no Claim of such Governmental Unit shall be Allowed against the Debtor, the Reorganized Debtor or their respective officers, employees or agents for taxes, penalties, interest, additions to tax or other charges arising out of (i) the failure, if any, of the Debtor, any of its Affiliates, or any other Person or Entity to have paid tax or to have filed any tax return (including any income tax return) in or for any prior year or period, or (ii) an audit of any return for a period before the Petition Date.

## MISCELLANEOUS PROVISIONS

***Retention of Jurisdiction.***  The Plan provides for the retention of jurisdiction by the Bankruptcy Court following the Effective Date to, among other things, determine all disputes relating to Claims, Equity Interests, and other issues presented by or arising under the Plan.  The Bankruptcy Court will also retain jurisdiction under the Plan for any

actions brought in connection with the implementation and consummation of the Plan and the transactions contemplated thereby. *See* Article 12 of the Plan for a more detailed description.

***Confirmation Order and Plan Control.*** To the extent the Confirmation Order or the Plan is inconsistent with the Disclosure Statement or any agreement entered into between the Debtor and any third party, unless otherwise expressly provided in the Plan, the Plan controls the Disclosure Statement and any such agreements, and the Confirmation Order (any and other orders of the Court) will be construed together and consistent with the terms of the Plan.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

**General**

The tax consequences of the Plan to the Debtor and to Holders of Claims and Equity Interests are discussed below. This discussion of the federal income tax consequences of the Plan to the Debtor and Holders under U.S. federal income tax law, including the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), is provided for informational purposes only. While this discussion addresses certain of the material tax consequences of the Plan, it is not a complete discussion of all such consequences and is subject to substantial uncertainties. Moreover, the consequences to a Holder may be affected by matters not discussed below (including, without limitation, special rules applicable to certain types of persons, such as persons holding non-vested stock or otherwise subject to special rules, nonresident aliens, life insurance companies, and tax-exempt organizations) and by such Holders' particular tax situations. In addition, this discussion does not address any state, local, or foreign tax considerations that may be applicable to particular Holders.

**HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.**

**THE DEBTOR'S GENERAL BANKRUPTCY COUNSEL HAS NO TAX EXPERTISE AND HAS NOT RESEARCHED OR ANALYZED TAX CONSEQUENCES RESULTING FROM THE PLAN.**

**SOME OF THE ISSUES DISCUSSED BELOW ARE COMPLEX, AND THERE CAN BE NO ASSURANCE OF THE ACCURACY OF THIS INFORMATION.**

**General Federal Income Tax Consequences to Holders**

*In General.*    The following discussion addresses certain of the material consequences of the Plan to Holders.  Under the Plan, the tax consequences of the Plan to a Holder will depend, in part, on the type of consideration received in exchange for the Claim or Equity Interest and the tax status of the Holder, such as whether the Holder is an individual, corporation or other entity, whether the Holder is a resident of the United States, the accounting method of the Holder, and the tax classification of the Holder's particular Claim or Equity Interest.  **HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIM OR EQUITY INTEREST.**

*Tax Consequences to Holders of Claims and Equity Interests.*  The Holders of Claims against and Equity Interests in the Debtor are urged to consult with their tax advisors as to the consequences of the Plan to them.  Among the issues the Holders of Claims and/or Equity Interests and their advisors may wish to consider are:

> (1)    The extent to which the Holder of a Claim and/or Equity Interest is entitled to a bad debt deduction or a worthless securities loss.

> (2)    The extent to which the Holder of a Claim or Equity Interest recognizes gain or loss on the exchange of its Claim or Equity Interest for property, debt, and stock of the Debtor and the character of that gain or loss.

> (3)    The basis and the holding period for any property, debt, and stock received by the Holder of a Claim or Equity Interest.

> (4)    Whether the original issue discount rules, market discount rule, and amortizable bond premium rules apply to any debt received by the Holder of a Claim or Equity Interest.

> (5)    The treatment of property, stock, or debt, if any, received by the Holder of a Claim or Equity Interest in satisfaction of accrued interest.

> (6)    The effect of a Holder of a Claim or Equity Interest receiving a deferred distribution or distribution that is contingent in amount.

36

**Certain Federal Income Tax Consequences to the Debtor**

*Cancellation of Indebtedness Income*.  Generally, cancellation of indebtedness triggers ordinary income to a debtor equal to the adjusted issue price (as determined for federal income tax purposes) of the indebtedness cancelled.  If debt is discharged in a Chapter 11 case, however, a debtor does not recognize cancellation of indebtedness income.  Instead, certain tax attributes otherwise available to the debtor are reduced by the amount of the indebtedness cancelled.  Tax attributes subject to reduction include: (i) net operating losses (NOL) and NOL carryforwards; (ii) most credit carryforwards; (iii) capital losses and carryforwards; (iv) the tax basis of the debtor's depreciable and non-depreciable assets; (v) passive activity loss and credit carryovers; and (vi) foreign tax credit carryforwards.

Under Sections 108(b) and 1017 of the Tax Code, attributes are reduced in the following order: first, net operating loss carryover; second, general business credit carryovers; third, capital loss carryovers; and fourth, tax basis.  In lieu of reducing net operating loss and carryovers, the taxpayer can elect to reduce tax basis first.  Such an election shall not apply to an amount greater than the aggregate adjusted bases of depreciable property held by the taxpayer as of the beginning of the taxable year following the taxable year in which the discharge occurs.

Therefore, any cancellation of indebtedness income realized by the Debtor would require a reduction in their NOLs or other tax attributes.  Because attribute reduction is calculated only after the tax for the year of discharge has been determined, however, the realization of substantial amounts of cancellation of indebtedness income as a result of implementation of the Plan should not diminish the NOLs and NOL carryforwards otherwise available to offset other income recognized in the year in which the Plan is consummated.

Additionally, any sale of Collateral pursuant to the Plan may result in taxable income to the Debtor if the tax basis in the Collateral is less than the sales price.

The Debtor does not believe that a principal purpose of the Plan is the avoidance of federal income tax within the meaning of Section 269 of the Internal Revenue Code.

**Importance of Obtaining Professional Tax Assistance**

This discussion is intended only as a summary of certain federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional.  The tax consequences are in many cases uncertain and may vary depending on a Holder's individual circumstances.  Accordingly, Holders are urged to consult with their tax advisors about the federal, state, local and foreign tax consequences of the Plan.

## VOTING ON AND CONFIRMATION OF THE PLAN

**Confirmation and Acceptance by All Impaired Classes**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if all of the requirements of Bankruptcy Code Section 1129 are met. Among the requirements for confirmation of a plan are that the plan be accepted by all Impaired Classes of Claims and Equity Interests, and satisfaction of the matters described below.

*Feasibility*. A plan may be confirmed only if it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. The Debtor believes that the Plan satisfies the test for feasibility under the Bankruptcy Code and applicable case law.

The obligations under the Plan to Holders of contingent, unliquidated, and Disputed Claims cannot be ascertained without the determination of the validity and amount of those Claims by the Bankruptcy Court. Until the Claim determination process is complete, the exact amount to be received by these cannot be ascertained.

*Best Interests Standard*. The Bankruptcy Code requires that the Plan meet the "best interest" test, which requires that members of a Class must receive or retain under the Plan, property having a value not less than the amount which the Class members would have received or retained if the Debtor was liquidated under Chapter 7, on the same date. The Debtor believes that the liquidation analysis attached hereto demonstrates that distributions to all Impaired Classes of Claims in accordance with the terms of the Plan would exceed the net distribution that would otherwise take place in Chapter 7, as no funds would be available to Unsecured Creditors in the event of a Chapter 7 liquidation.

**Confirmation Without Acceptance by All Impaired Classes**

If one or more of the Impaired Classes of Claims or Equity Interests does not accept the Plan, the Plan may nevertheless be confirmed and be binding upon the non-accepting Impaired Class under the "cram-down" provisions of the Bankruptcy Code, if the Plan does not "discriminate unfairly" and is "fair and equitable" to the non-accepting Impaired Classes under the Plan.

*Discriminate Unfairly*. The Bankruptcy Code requirement that a plan not "discriminate unfairly" means that a dissenting class must be treated equally with respect to other classes of equal rank. The Debtor believes that the Plan does not "discriminate unfairly" with respect to any Class of Claims or Equity Interests because no class is afforded treatment which is disproportionate to the treatment afforded other Classes of equal rank.

*Fair and Equitable Standard*.  The "fair and equitable" standard, also known as the "absolute priority rule," requires that a dissenting class receive full compensation for its allowed claims or interests before any junior class receives any distribution.  The Debtor believes the Plan is fair and equitable to all Classes pursuant to this standard.

With respect to the Impaired Classes of Secured Claims, Bankruptcy Code Section 1129(b)(2)(A) provides that a plan is "fair and equitable" if:  (i) the holders of such claims retain the lien securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and each holder of a claim of said class receives on account of such claims deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; or (ii) it provides for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property free and clear of such liens; or (iii) it provides for the realization by such holders of the indubitable equivalent of such claims.  With respect to CJUF, the Debtor believes that the Plan meets the standard for fair and equitable treatment pursuant to Section 1129(b)(2)(A) (i).

With respect to the Impaired Classes of Unsecured Claims, Bankruptcy Code Section 1129(b)(2)(B) provides that a plan is "fair and equitable" if it provides that (i) each holder of a claim of such a class receives or retains on account of such claim, property of a value as of the effective date of the plan equal to the allowed amount of such claim; or (ii) the Holder of any claim or interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or interest.  The Debtor believes that the Plan meets these standards.

The Debtor intends to evaluate the results of the balloting and determine whether to seek Confirmation of the Plan in the event that less than all the Impaired Classes of Claims do not vote to accept the Plan.  The determination as to whether to seek Confirmation under such circumstances will be announced before or at the Confirmation Hearing.

**Absolute Priority Rule**

The Bankruptcy Code and other applicable law establish the priority for distribution of funds in bankruptcy cases.  These priority provisions are sometimes referred to as the "absolute priority" rule.  Normally, and subject to exceptions not relevant here, valid secured claims are first paid to the extent of the amount of the claim or the value of the claimant's collateral (if less than the claim).

Any property in the Estate, net of the valid secured claims described above, is first distributed to holders of priority claims, including (a) the costs of administering the Bankruptcy Case; (b) certain wage and benefit claims; and (c) certain tax claims.  After

payment of priority claims, unsecured creditors share pro rata in the remaining funds until paid in full.  Equity holders (i.e., members) are paid only after all creditors have been paid.

**Non-Confirmation of the Plan**

If the Plan is not confirmed by the Bankruptcy Court, the Court may permit the filing of an amended plan, dismiss the case, or convert the case to Chapter 7.  In a Chapter 7 case, the Debtor's assets would be sold and distributed to the Unsecured Creditors after the payment of all Secured Claims, costs of administration, and the payment of priority claims.

The cost of distributing the Plan and this Disclosure Statement, as well as the costs, if any, of soliciting acceptances, will be borne by the Estate.

<u>**ALTERNATIVES TO CONFIRMATION
AND CONSUMMATION OF THE PLAN**</u>

If the Plan is not confirmed, the potential alternatives include: (a) alternative plans under Chapter 11 (including a liquidation plan), (b) dismissal of the case, or (c) conversion of the case to a case under Chapter 7 of the Bankruptcy Code.

**Alternative Plans of Reorganization**

If the Plan is not confirmed, the Debtor could attempt to formulate and propose a different plan or plans.  The Debtor believes that the Plan will enable Creditors to be paid the maximum amount possible for their Allowed Claims.

**Liquidation under Chapter 7 or Chapter 11**

If a plan is not confirmed, the Bankruptcy Case may be converted to a Chapter 7 liquidation case.  In a Chapter 7 case, a trustee would be appointed to liquidate the assets of the Debtor.  Converting the case to Chapter 7 would simply add an additional layer of administrative expenses to the Estate which would eliminate any funds available for distribution to Unsecured Creditors.  The proceeds of the liquidation would be distributed to the Creditors of the Debtor in accordance with the priorities established by the Bankruptcy Code.

In general, the Debtor believes that liquidation under Chapter 7 would result in diminution of the value of the interests of the Creditors because of (a) additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee; (b) additional expenses and claims, some of which might be entitled to priority, which would arise by reason of the

liquidation; (c) failure to realize the full value of the Debtor's assets; (d) the inability to utilize the work-product and knowledge of the Debtor and its Professionals; (e) the substantial delay which would elapse before Creditors would receive any distribution in respect of their Claims; and (f) the loss to Unsecured Creditors.

The Debtor believes that the Plan is superior to liquidation under Chapter 7 or Chapter 11.

## <u>SUMMARY, RECOMMENDATION AND CONCLUSION</u>

The Debtor believes that the Plan is in the best interests of all Creditors.  In the event of a liquidation of the Debtor's assets under Chapter 7 of the Bankruptcy Code, the Debtor believes there would be no distribution to Unsecured Creditors.  For these reasons, the Debtor urges that the Plan is in the best interests of all Creditors and that the Plan be accepted.

[Remainder of page intentionally left blank]

Dated as of November 5, 2013.

Respectfully submitted,

RGR Watkins, LLC

By: _____
Robert G. Roskamp
Its Manager